OPINION OF THE COURT
Louise Gruner Gans, J.
*243 This decision follows the trial, without a jury, of a class action for damages for breach of contract and for an accounting, involving a multimillion dollar limited partnership, ML-Lee Acquisition Fund, L.P. (hereinafter the Fund). Plaintiffs are granted judgment against defendants Mezzanine Investments, L.P., Thomas H. Lee, Vernon R. Alden, Joseph L. Bower and Stanley H. Feldberg.
The action was commenced by John Winston, owner of five units of the Fund, purchased in 1987 for $5,000. Plaintiff class, as certified before trial, consists of the approximately 39,600 investors who were limited partners of the Fund in 1990.[1] Members of the class supplied 99% of the Fund’s capital, amounting to approximately $500,000,000.
Defendant Mezzanine Investments, L.P., contributed 1% of the Fund’s capital and is the managing general partner (MGP) of the Fund, responsible for overseeing and monitoring the management of the Fund’s investments. Defendants Thomas H. Lee, Vernon R. Alden, Joseph L. Bower and Stanley H. Feldberg are the individual general partners of the Fund.[2]
The Fund was created and its operations were prescribed by a limited partnership agreement, dated August 12, 1987. The agreement, as attached to the Fund’s October 12, 1987 prospectus, as well as a sales brochure, were submitted to prospective limited partner investors.
The Fund was designed to provide relatively small individual investors with the opportunity, as limited partners, to invest in "mezzanine” securities consisting primarily of subordinated debt and/or preferred stock linked with equity participation in common stock, and/or rights to acquire common stock, in connection with leveraged buyout transactions and other recapitalization. This kind of investment opportunity previously had only been available to large individual and institutional investors, and was intended to provide income and long-term capital gains at levels exceeding those generally available from publicly traded debt instruments.
The Fund had a limited expected duration of approximately 10 years, at the expiration of which the Fund’s assets are to be liquidated and the proceeds distributed to the limited partners and the managing general partner. During the life of the Fund, however, units of the Fund are not redeemable and there is no *244 market for them. The Fund’s prospectus warned in no uncertain terms that this was a high-risk investment. Thomas H. Lee Advisors, Inc., the sole limited partner of Mezzanine Investments, L.P., is the investment advisor of the Fund. It was not a party to this action.
It is conceded that the limited partners had no role in negotiating and drafting the partnership agreement, and became parties to it on a take it or leave it basis. Investors could become limited partners by subscribing to buy a limited partnership interest, by making payment for such an interest, or by executing a counterpart of the partnership agreement.
The Fund was essentially a creation of Merrill Lynch & Co., Inc., its subsidiary affiliates, Merrill Lynch, Pierce, Fenner & Smith and ML Mezzanine Inc., and of the Thomas H. Lee Company, Inc. and its principal, Thomas H. Lee. Negotiations were conducted mainly by Kevin K. Albert and Rosalie Goldberg of Merrill Lynch & Co., Inc., and Thomas H. Lee, David Harkins and Scott Schoen of Thomas H. Lee Company, Inc., and resulted in the formation of Mezzanine Investments, L.P. and of the ML-Lee Acquisition Fund, L.P.
These parties recruited defendants Alden, Bower and Feldberg to be the three "independent” individual general partners of the Fund. All the participants, other than the limited partners, were represented by their own counsel. Counsel for Merrill Lynch and its subsidiary Mezzanine entities drafted the partnership agreement in dispute here and the prospectus, subject to review by counsel for the Thomas H. Lee Company and the individual general partners. Albert and Schoen participated in the preparation of the Fund’s sales brochure.
Article 4 of the limited partnership agreement sets out a multitiered prioritized scheme for periodic distributions to the limited partners and to the managing general partner of monies defined as "Distributable Cash from Investments” (§ 4.1), and as "Distributable Capital Proceeds” (§ 4.2). The limited partnership agreement anticipates various kinds of investments, with different treatment of monies generated by the Fund prescribed depending on their source. This litigation concerns only the distributions from the so-called "Qualified Investments” consisting either of "Mezzanine Investments” or "Bridge Investments” or both, which are the subject of sections 4. IB (2) and 4.2B (2) of the limited partnership agreement.
These sections read as follows:
"section 4.1 Distributions of Distributable Cash from Investments * * *
*245 "-B. All Distributable Cash from Investments for each fiscal quarter of the Partnership shall * * * be distributed by the Individual General Partners within 45 days after the close of such quarter, as follows * * *
"2) From the following sources:
"(i) Mezzanine Investments; and
"(ii) That portion of Bridge Investments which are expected to become Mezzanine Investments at liquidation of such Bridge Investments within nine months;
"(a) first, to the Partners, pro rata in proportion to their Capital Contributions (that is, 99% to the Limited Partners, as a class, and 1% to the Managing General Partner) until the Limited Partners, as a class, shall have received from distributions then or theretofore made pursuant to this Section 4. IB (2) or Section 4.2B (2), an amount equal to the Priority Return and any outstanding unpaid Compensatory Payment balance;
"(b) second, 100% to the Managing General Partner until the Managing General Partner shall have received an amount equal to any outstanding Deferred Distribution Amount;
"(c) third, 69% to the Limited Partners, as a class, and 31% to the Managing General Partner (30% being an incentive distribution, an 'MGP Distribution’), until the Managing General Partner shall have received from distributions then or theretofore made pursuant to this Section 4.IB (2) and Section 4.2B (2), an amount equal to 21% of all such distributions;
"(d) fourth, thereafter, 79% to the Limited Partners, as a class, and 21% to the Managing General Partner (20% being an MGP Distribution) * * *
"section 4.2 Distributions of Proceeds Arising from a Capital Transaction * * *
"B. Distributable Capital Proceeds shall, as promptly as practicable after the applications provided for in Section 4.2A * * * be distributed by the individual General Partners as follows:
"(2) From the following sources:
"(i) Mezzanine Investments; and
"(ii) That portion of Bridge Investments which are expected to become Mezzanine Investments at liquidation of such Bridge Investment within nine months;
"(a) first to the Partners, pro rata in proportion to their Capital Contributions (that is, 99% to the Limited Partners, as a class, and 1% to the Managing General Partner), until the *246 Limited Partners, as a class, shall have received, from distributions then or theretofore made pursuant to Section 4.1B (2) or this Section 4.2B (2), an amount equal to the Priority Return and any outstanding unpaid Compensatory Payment balance;
"(b) second, 100% to the Managing General Partner until the Managing General Partner shall have received an amount equal to any outstanding Deferred Distribution Amount;
"(c) third, to the Partners, pro rata in proportion to their Capital Contributions, until the Limited Partners, as a class, shall have received from distributions then or theretofore made pursuant to Section 4.IB (2) or this Section 4.2B (2), an amount equal to the amount of their Net Capital Contributions represented by Mezzanine Investments together with the Priority Return and unpaid outstanding Compensatory Payments referred to in clause (1) above;
"(d) fourth, 69% to the Limited Partners, as a class and 31% to the Managing General Partner (30% being an MGP Distribution), until the Managing General Partner shall have received from distributions then or theretofore made pursuant to Section 4. IB (2) and this Section 4.2B (2), an amount equal to 21% of all such distributions;
"(e) fifth, thereafter, 79% to the Limited Partners, as a class, and 21% to the Managing General Partner (20% being an MGP Distribution).”
The partnership agreement has a so-called "claw-back” or "compensatory payment” provision, which defendants characterize as an "investor protection.” If at the end of the Fund, when all the investments are liquidated, the limited partners have not received distributions sufficient to equal their original capital contributions, the MGP is obligated to return from the incentive compensation it previously received, an amount sufficient to make whole those capital losses. According to the agreement, " 'Compensatory Payment’ means an amount equal to the aggregate of (a) the cumulative amount by which the Distributable Capital Proceeds related to the Sales of Qualified Investments are less than the Partnership’s cost of such Qualified Investments, but only to the extent of the excess of cumulative MGP Distributions then or theretofore made over the cumulative amounts of payments then or theretofore made as Compensatory Payments pursuant to Sections 4. IB (2) (a) and 4.2B (2) (b) and (b) the cumulative amount of MGP Distributions with respect to those portions of Bridge Investments which were expected to become Mezzanine Investments at liquidation within nine months, but which did not actually *247 become Mezzanine Investments within nine months or, with the approval of the Individual General Partners, twelve months time.”
There is no provision for the maintenance of a reserve fund by the Fund from which compensatory payments could be made. All MGP distributions, when made, are immediately transferred to the investment advisor, Thomas H. Lee Advisors, Inc., as the sole limited partner of Mezzanine Investments, L.P. As such, the sums distributed are no longer in the control of Mezzanine Investments, L.P. as managing general partner. of the Fund. The availability of MGP distributions for compensatory payments depends upon the return of monies by the investment advisor to Mezzanine Investments, L.P. and to that extent is contingent and uncertain.
The parties dispute the meaning and application of the provisions of the partnership agreement for partnership distributions, specifically involving payment of a "priority return” to the limited partners and of incentive compensation to the managing general partner designated as "MGP Distributions.”
The partnership agreement defines "priority return” as "the amount of cumulative, noncompounded return of 10% per annum on the average daily amount of the Gross Capital Contributions represented by Mezzanine Investments.” "MGP Distributions” are defined by the partnership agreement as the "incentive distributions provided for in Sections 4. IB (2) (c) and (d) and 4.2.B (2) (d) and (e).”
According to plaintiff, defendants have breached the provisions of the agreement requiring payment of a "priority return” to the limited partners before any distribution is made to the managing general partner and have wrongly calculated the "MGP Distributions,” with the consequence that the limited partners have been underpaid, while the managing general partner has received distributions to which it was not entitled and has been overpaid.
The parties do not dispute that the basic idea of the "priority return” is to guarantee to the limited partners a first payment preference with respect to a portion of the partnership distributions. Nor do the parties dispute that the managing general partner’s distribution functions as performance-based compensation intended to reward the managing general partner for superior performance if the priority return is achieved.
Rather, the issue is the method defendants have used to compute the "priority return” and whether that method is con *248 sistent with the definition of "priority return” in the partnership agreement. Central to the definition of "priority return” are the terms "return” and "cumulative”, neither of which is defined in the partnership agreement. A further issue is presented as to defendants’ application of the term "cumulative” to calculate "MGP Distributions” payable to Mezzanine Investments, L.P.
THE AMBIGUOUS CONTRACT
Prior to trial, in denying defendants’ motion for summary judgment, the Honorable Elliott Wilk ruled that the meaning of the term "cumulative” in the definition of "priority return” in the partnership agreement was unclear on its face. Justice Wilk’s decision was affirmed on appeal (Winston v Mezzanine Invs., 203 AD2d 206 [1st Dept 1994]). The Appellate Division held: "We agree that * * * the word 'cumulative’, as used in the definition of the term 'Priority Return’ in the limited partnership agreement, is ambiguous and its intended meaning cannot be construed as a matter of law.” (Supra.)
The question of whether a contract provision is ambiguous, being one of law (W.W.W. Assocs. v Giancontieri, 77 NY2d 157, 162 [1990]), the determination of ambiguity was law of the case for purposes of the trial. Even though the denial of a motion for summary judgment ordinarily has no preclusive effect (Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C3212:21), the prior determination here is law of the case because it derived from an affirmed denial of summary judgment which resolved a "pure question of law”. (Telaro v Telaro, 25 NY2d 433, 437 [1969], rearg denied 26 NY2d 751 [1970].)
This court further concludes that the meaning of "priority return” as used in the partnership agreement is unclear because the term "return” is likewise ambiguous and reasonably subject to conflicting interpretations. (Van Wagner Adv. Corp. v S. & M. Enters., 67 NY2d 186, 191 [1986]; Chimart Assocs. v Paul, 66 NY2d 570, 572-573 [1986].)
Plaintiff’s position is that in financial markets the term "return” is customarily understood to refer to income together with realized and unrealized gains and losses minus expenses,[3] and that under the partnership agreement the "priority return” must be calculated accordingly. Defendants’ position, *249 on the other hand, is that under the agreement "return” refers only to income and realized gains and losses minus expenses and that defendants properly calculated "priority return” on that basis.
Absent definitions of "return” and "cumulative”, the language of the partnership agreement, and specifically article 4, does not clearly support either position. The meaning of the term "return” used in the context of a financial agreement is not self-evident. It is a term of art whose meaning does not unequivocally emerge from the context in which it is used. Reasonable minds could differ as to its meaning. Defendants’ argument that "return” must be measured only by cash proceeds and plaintiff’s argument that it refers to a measure of over-all performance, which includes but is not limited to cash, are both plausible.
The point of departure for the court’s analysis of this case thus continues to be an ambiguous contract.
CRITERIA FOR CONTRACT INTERPRETATION
Turning to the criteria for contract interpretation, if a contract provision is reasonably susceptible of more than one interpretation, facts and circumstances extrinsic to the agreement can be considered to determine the intention of the parties. (Chimart Assocs. v Paul, supra, at 572-573; 67 Wall St. Co. v Franklin Natl. Bank, 37 NY2d 245, 248 [1975].) Parol evidence of conversations, negotiations and agreements made prior to or contemporaneous with the contract in question (supra, at 248-249), and relating to the subject matter of the contract (Anchin, Block & Anchin v Pennsylvania Coal & Coke Corp., 284 App Div 940, 941 [1st Dept 1954], affd 308 NY 985 [1955]; Levinson v Shapiro, 238 App Div 158, 160 [1st Dept], affd 263 NY 591 [1933]), the relationship of the parties (St. Regis Paper Co. v Hubbs & Hastings Paper Co., 235 NY 30, 35-36 [1923]; J & R Lamb v Norcross Bros. Co., 208 NY 427, 431 [1913]), the purpose or object of the contract, or of a specific provision of the contract (Matter of Cromwell Towers Redevelopment Co. v City of Yonkers, 41 NY2d 1, 6 [1976]; O’Neil Supply Co. v Petroleum Heat & Power Co., 280 NY 50, 55 [1939]; Manson v Curtis, 223 NY 313, 320 [1918]), and of industry custom and usage (Merritt Assocs. v Scollard, 161 AD2d 502 [1st Dept 1990]), is admissible to explain an ambiguity.
Moreover, in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to the party who had no voice in the selection of *250 the language. (Matter of Cowen & Co. v Anderson, 76 NY2d 318, 323 [1990]; Jacobson v Sassower, 66 NY2d 991, 993 [1985]; 67 Wall St. Co. v Franklin Natl. Bank, supra, at 249; Rentways, Inc. v O’Neill Milk & Cream Co., 308 NY 342, 348 [1955]; Matter of PaineWebber, Inc. v Webb, 155 AD2d 938 [4th Dept 1989].)
Plaintiff contends that the limited partnership agreement is a contract of adhesion, and as such must be strictly construed against defendants as the drafters. The court need not reach this issue, however, because although this rule of construction has been applied to contracts characterized as contracts of adhesion {see, e.g., 67 Wall St. Co. v Franklin Natl. Bank, supra [lease]; Herbil Holding Co. v Commonwealth Land Tit. Ins. Co., 183 AD2d 219 [2d Dept 1992] [insurance policy]), it has long been applied to a broad range of contracts not identified as contracts of adhesion as long as it is clear that only one or some of the parties drafted the agreement (see, e.g., Matter of Cowen & Co. v Anderson, supra [securities company/customer agreement]; Jacobson v Sassower, supra [legal fee agreement]; Matter of PaineWebber, Inc. v Webb, supra [stockbroker/ customer agreement]; Slatt v Slatt, 102 AD2d 475, 476-477 [1st Dept 1984], affd 64 NY2d 966, rearg denied 65 NY2d 785 [1985] [separation agreement]).[4]
Defendants argue that in determining the intention of the parties here, the only relevant intent is that of the parties who, with the assistance of their counsel, actually negotiated the creation and drafting of the Fund: Kevin K. Albert and Rosalie Goldberg acting for Merrill Lynch, Mezzanine Investments, L.P. and ML Mezzanine Inc.; and Scott Schoen, Thomas H. Lee and David Harkins, acting for the Thomas H. Lee Company and for Thomas H. Lee himself.[5] Further, according to Mr. Albert, in negotiating the partnership agreement he also acted on behalf of the limited partner investors. The court rejects both positions as without merit.
Despite the fact that plaintiff Winston (and members of the class he represents) played no role in the actual drafting of the agreement, he is nevertheless in the position of a party to the *251 agreement, and his intention in entering into the agreement along with the intention of the defendants must be considered in interpreting its terms. (See, e.g., Matter of Cowen & Co. v Anderson, supra [interpretation of arbitration clause in form agreement between securities company and customer].) Moreover, although Albert asserts that in negotiating the creation of the Fund he represented the interests of potential investors, many of whom were existing customers of Merrill Lynch, he was not a disinterested representative.
Mr. Albert’s testimony that he negotiated various features of the Fund, including the priority return and percentage of sales commissions, so as to make it more attractive to investors, does not change the fact that Merrill Lynch (including both Merrill Lynch & Co. and Merrill Lynch, Pierce, Fenner & Smith, Inc.) directly and through its interest in Mezzanine Investments, L.P. and ML Mezzanine Inc., expected to derive significant benefits from the sale of Fund units and from administering the Fund, and that it traded off very significant financial advantages to Thomas H. Lee and his companies in order to create the Fund and reap those benefits.
The creation of the Fund gave Mr. Lee and his companies control over an enormous pool of money — half a billion dollars — most of which they could use to buttress their own LBO investments, incentive fees of up to 20% of the Fund’s partnership distributions,[6] as well as the investment advisor’s fee, which for the years 1988, 1989 and 1990 amounted to more than $16 million. Merrill Lynch derived approximately $30 million in commissions on sales of Fund units. For the years 1988, 1989 and 1990, ML Mezzanine Inc. collected over $6 million in Fund administration fees. At best, in relation to the limited partners, Mr. Albert’s role as a negotiator has to be characterized as one of divided loyalty.
Mr. Albert’s efforts and concerns notwithstanding, the limited partners did not participate in the negotiation and drafting of the partnership agreement and the agreement must be strictly construed against the defendants.
*252 RETURN AND PRIORITY RETURN
The prospectus and the sales brochure used to interest investors in the Fund are the most obvious sources of extrinsic evidence as to the intent underlying the ambiguous terms of the partnership agreement for limited partner and managing general partner distributions, but are of no assistance in fathoming the parties’ intent in this case. With respect to "priority return”, they generally repeat the language of the partnership agreement.[7]
Like the partnership agreement, these documents repeat the term "return” countless times, without consistency or precision. No provision, set of provisions, phrase or set of phrases clarifies the meaning of "return” in the context of "priority return”. Throughout, the priority return is described in only the most generic sense, without restricting the meaning of "return”.
The only argument defendants have made which is limited to the language of the partnership agreement, as well as the prospectus, is that in the agreement and the prospectus the term "return” in "priority return” refers only to cash distributions and that therefore it must be based solely on cash currently generated by the Fund. This argument is not persuasive. The court agrees that the term "return” in "priority return” is an element of a formula for determining how cash generated by the Fund is to be allocated and at what point the managing general partner is entitled to incentive compensation.
However, neither the definition of "priority return”, nor the context in which it is used, states that it is to be measured solely in terms of cash. If this were the intention of the drafters of the agreement, they failed to say so. Nothing in the language or structure of the agreement or the prospectus is inconsistent with distributing cash proceeds on the basis of overall performance, as plaintiff claims it must be.
*253 The court is persuaded that the meaning of "return” in the phrase "priority return” must be derived from the purpose of the "priority return” provision which is not inconsistent with the language of the agreement.
While not representing that he relied on specific language of the partnership agreement, the prospectus or the sales brochure, plaintiff Winston testified at trial and in his deposition, in essence, that he received and examined some of the Fund’s written materials and discussed features of the Fund with a Merrill Lynch broker who brought the Fund to his attention. Based on a description of the Fund and his knowledge of how a priority return functioned in the context of other limited partnership investment funds with which he was familiar as president of DLJ Real Estate, Inc., he expected, when he made his investment, that he would receive a distribution of a least 10% per year, that limited partners would get their 10% priority return before the managing general partner would share in any incentive fee, and that the priority return would reflect the changing net asset value of his investment over time.
Against these expectations, Mr. Winston testified that he became concerned with the operation of the Fund when the 1989 annual report for the Fund showed unrealized losses of approximately $11 million on two investments, and when the Fund’s quarterly reports for the first two quarters of 1990 showed that while cash distributions to the limited partners equalled just 2% of their investment and a number of the Fund’s investments were performing poorly, the managing general partner received MGP incentive fees of over $3.5 million.
Mr. Winston’s concern intensified with the receipt of the Fund’s 1990 annual report, showing further unrealized losses of $44 million,, a decrease in the net asset value of each partnership unit from $1,000 to $839, and total payments to limited partners of $55 per unit for 1990, coupled with payment of more than $7.5 million in incentive fees to the managing general partner. He commenced this action in response to these figures.
To validate his understanding of the priority return as provided for in the partnership agreement, Mr. Winston also presented the testimony of a highly qualified expert witness, Hugh R. Lamle, executive vice-president of M.D. Sass Investor Services, Inc. Mr. Lamle testified that the term "return” as commonly used and generally understood in the financial community, including the investment management community, *254 means "total return comprised of income plus realized gains and losses plus unrealized gains and losses, less expenses.” He explained that if this common meaning of "return” is not used in computing the "priority return” and the "MGP incentive fee”, and the managing general partner is paid incentive compensation, even when there is a significant current decline in the value of mezzanine investments, the underlying purpose of a performance based distribution scheme is undermined, or defeated; in effect the incentive fee is paid regardless of performance.
Mr. Lamle further explained that under common usage in the financial community, return is distinguishable from yield; yield involves only the income from an investment, while return also involves the "change in the value of the securities realized or unrealized”. Defendants’ interpretation of return, therefore, is more akin to yield, yet the word yield was not used to define the word "return” in the context of "priority return” in the partnership agreement.
Defendants did use the word yield, however, in the Fund’s 1988 and 1989 annual reports, and in internal reports prepared by the Fund’s chief financial officer in 1990 and 1992 for submission at quarterly meetings of the individual general partners and the managing general partner. These reports characterize the cash distributed to the limited partners as the "annualized cash yield”, as opposed to "return”. Thus, despite the distinctions in the financial community between return and yield, defendants used these terms interchangeably.
Based on the testimony of Mr. Lamle and Mr. Winston for plaintiff, as well as on the testimony of Mr. Schoen for defendants that he knew of the interpretation of return to mean "total return”, the court is persuaded that the use of the term return as meaning "total return” was commonly recognized in the professional investment management community, particularly in relationship to limited partnership investment funds.[8] On that basis, defendants should have known that use of the phrase "priority return” in the partnership agreement without a limiting definition of "return” might cause investors such as Mr. Winston to understand it as incorporating the total return concept.
Defendants do not controvert Mr. Lamle’s testimony as to the common usage of "return”. Defendants argue that they did *255 not and could not intend to include unrealized gains and losses in computing the priority return, because the Fund is comprised of investments for which there is no readily available market, and therefore no objective basis exists for valuation. They assert that any valuation of these illiquid investments would be extremely subjective and unreliable. The court finds this argument unpersuasive.
It is uncontroverted that defendants have valued these investments for income tax purposes, and that the Fund’s financial statements and quarterly and annual reports have reported a net asset value which includes unrealized gains and losses. The unrealized depreciation in the Fund’s quarterly and annual reports is what so greatly concerned.Mr. Winston in the first place.
On cross-examination, Mr. Schoen admitted that a number of objective factors are considered in determining the reported net asset value, and that this valuation is the result of a collaborative effort involving the Lee Company, Merrill Lynch counsel and the accountants. Because the priority return is determined on a cumulative basis, any errors in favor of undervaluation will be corrected when the unrealized gains or losses are realized.
The court likewise rejects defendants’ assertion that plaintiff’s interpretation of the priority return would lead to anomalous results in the event the Fund generated no cash from income or capital transactions. The Fund’s financial statements show that when the Fund does not have sufficient cash to meet the priority return hurdle, the shortfall is simply accounted for as a deficit, which is satisfied in future quarters when sufficient cash is available. Defendants should be able to employ this same or a similar method to account for any deficit under plaintiff’s definition of priority return.
Defendants, through the testimony of Messrs. Albert and Schoen, acknowledge that they intended the priority return provision to function as a protection for the limited partner investors. It was to be a hurdle which the managing general partner had to achieve before it was entitled to collect incentive compensation for the benefit of the investment advisor.
Calculation of the cumulative annual priority return, without considering contemporaneous changes in the net asset value of the limited partners’ investment, is inconsistent with that purpose. It requires the limited partners to assume a disproportionate share of the risk of loss in the final calculation of priority return and MGP distributions at the Fund’s termination.
*256 Although the "claw-back” feature (provision for compensatory payment) of the partnership agreement purports, at least on its face, to protect limited partners against loss of capital invested, it does not provide a mechanism for the truing up of excessive payment of MGP incentive fees above that amount. Consequently, without consideration of current net asset value in determining whether the priority return hurdle has been satisfied, and provided only that the Fund breaks even on its capital transactions, the limited partners could end up with less than their cumulative 10% per year without the managing general partner having to pay back excess MGP distributions. Since, as previously noted, the "claw-back” feature of the Fund is not self-executing and is contingent on repayment of monies which have left the Fund, under defendants’ interpretation of priority return, the limited partners assume essentially the entire risk over the life of the Fund, both of the Fund’s failure to achieve the priority return and of capital loss. This allocation of risk undercuts the incentive to the managing general partner to perform for the benefit of the limited partners, defeats the purpose of the priority return mechanism, and is unreasonable in relation to the purposes of the "priority return” and incentive fee mechanisms.
Having considered the language of the partnership agreement, the prospectus and the sales agreement, the uses of the term "return” in the financial world, and evidence of the intention of the parties and their purposes in entering into the agreement, the court concludes that the meaning of return for purposes of calculating the priority return must include unrealized as well as realized gains and losses and income. Although the use of the word return is susceptible to both plaintiffs and defendants’ interpretation, the agreement must be strictly construed against defendants. So construed, plaintiff’s interpretation is more consistent with the purposes of the agreement and more reasonable in light of those purposes. The partnership agreement is entirely the product of defendants’ creation and had defendants intended to circumscribe the meaning of return, it was incumbent upon them to make the agreement clear and specific as to their intentions.
CUMULATIVE
For plaintiff and defendants, the "cumulative” aspect of the "priority return” is an essential element of the Fund’s distribution scheme. An issue presented with respect to the meaning of the word "cumulative” is whether the limited partners *257 are entitled to a 10% priority return payable each year as a condition to the payment of an incentive fee in the same year, or whether the 10% priority return is based on all past distributions to the limited partners as of the time when it is calculated.[9]
On this issue, the court concludes that the limited partners’ 10% priority return is aggregated each year and measured against all distributions to the limited partners cumulatively from the inception of the Fund. Payment of a new 10% each year is not required to satisfy the priority obligation.
The limited partners receive their 10% priority return pursuant to the tier 1 level of the cash distribution scheme. Tier 1 is outlined in the parallel sections 4. IB (2) (a) and 4.2B (2) (a) of the partnership agreement which are quoted in full on pages 244- 245 (supra); tier 2 is outlined in the parallel sections 4. IB (2) (c) and 4.2B (2) (d) which are also quoted in full on pages 245- 246 (supra).
Reading these provisions in conjunction with the definition of priority return in article l,[10] the 10% priority obligation is cumulated each year and the cumulated sum represents a hurdle amount that must be paid first to the limited partners until they "shall have received from distributions then or theretofore made pursuant to this Section 4. IB (2) or Section 4.2B (2), an amount equal to the Priority Return” (emphasis added).
The prospectus describes tier 1 as "cumulative distributions from Mezzanine Investments * * * [in] an amount equal to an aggregate return (cumulative but not compounded) of 10% per annum” and "distributions then, or theretofore made * * * in an amount equal to the aggregate annual (cumulative but not compounded) return of 10% per annum.” The 10% priority return is aggregated each year and that aggregated amount represents the maximum amount to which the limited partners are entitled under tier 1.
However, because the tier 1 priority obligation is based on distributions "then or theretofore made”, previous distributions pursuant to tier 1 and tier 2 are included for the purpose of determining whether the limit on tier 1 distributions has been reached. In other words, the limited partners are paid *258 99% of the cash that is available for distribution during a given year, until they have received from previous distributions, including previous tier 1 and tier 2 distributions, the amount that is equal to the current aggregated priority obligation.
Thus, to determine, on an annual basis, how much should be distributed pursuant to tier 1, one must add together all previous distributions to the limited partners (i.e., tier 1 and tier 2 distributions) and compare that sum to the aggregate of the 10% priority return for each preceding year of the Fund’s existence.
If the sum of the previous payments to the limited partners is less than the cumulative priority obligation, then the limited partners receive the difference between those amounts as their tier 1 distribution; any amount exceeding the difference is distributed pursuant to tier 2. However, if the sum of the previous payments to the limited partners is equal to or greater than the cumulative priority obligation, the priority obligation has already been satisfied, so the limited partners are paid nothing pursuant to tier 1; the entire amount is distributed to the limited partners and the managing general partner pursuant to tier 2.
Defendants’ records for the years 1987, 1988, 1989 and 1990 show that this is the method they employed in calculating the tier 1 and tier 2 quarterly distributions of cash. Mr. Schoen and Mr. Sullivan testified as to this method as part of defendants’ case.
The court rejects plaintiff’s interpretation that the limited partners are entitled to the payment of a 10% priority return in each year without regard to any prior distributions to them. Plaintiff’s interpretation is wholly inconsistent with the language in the partnership agreement and the prospectus, directing that the tier 1 cumulative priority obligation be satisfied out of "distributions then or theretofore made” to the limited partners.
Although plaintiff contends that from 1987 through the end of 1990 defendants received incentive fees exceeding their 30% share of the excess cash that was available for distribution pursuant to tier 2, defendants’ financial statements for 1987 through 1990 show that the excess cash that was actually available for tier 2 distributions totalled $80,900,018, of which defendants’ $24,270,006 incentive fee share is exactly 30%. The wide discrepancy between plaintiff’s and defendants’ calculations of the total excess cash is attributable to plaintiff’s *259 failure to account for distributions "then or theretofore made” to the limited partners in determining the amount of the tier 1 distributions.
Once the previous distributions are included in computing the tier 1 priority obligation, the amount of cash exceeding the priority obligation increases significantly, which results in increasing the tier 2 pool to be divided 70/30% between the limited and general partners.
DAMAGES
Finally, the court must deal with the issue of damages. Plaintiff offered several calculations of damages based upon his various arguments as to the interpretation of the partnership agreement, and defendants submitted no evidence to controvert any of these calculations. Although the court agrees with plaintiff that the Fund’s unrealized gains and losses should be included in the definition and calculation of the "priority return”, the court declines wholly to accept plaintiff’s calculations of the excessive incentive fees. As previously discussed, plaintiff’s calculation as to whether the priority return has been satisfied and his calculation of the amount of tier 2 excess cash are not entirely consistent with the terms of the partnership agreement as now interpreted by the court.
The court, therefore, has computed the tier 1 and tier 2 distributions for the periods in which the Fund suffered unrealized losses: the fourth quarter of 1989 through the fourth quarter of 1990.[11] The court employs defendants’ method of computing these distributions where the cumulative priority obligation is compared to the total distributions previously received by the limited partners, to determine whether the priority return has been satisfied. However, the amount of the cumulative priority obligation must now include the unrealized losses. What plaintiff designates as the "cumulative priority total return” is the priority obligation recalculated to include the Fund’s unrealized losses, and is now substituted for the amounts defendants designate as the "cumulative priority obligation”.
After recalculating the tier 1 and tier 2 distributions, the court concludes that the managing general partner received a total of $6,627,752 in excess and improper distributions during the period from the fourth quarter of 1989 through the fourth *260 quarter of 1990.[12] There should have been tier 1 distributions in all five of these quarters, and tier 2 distributions in only the fourth quarter of 1989 and the first quarter of 1990. Instead, tier 1 distributions were only made in the third and fourth quarters of 1990, and tier 2 distributions were made in all five of these quarters.
Accordingly, plaintiff and members of the class he represents are entitled to judgment in the amount of $6,627,752, with interest from June 30, 1990.

. The word plaintiff is used in the singular for ease of presentation only.

. The action was dismissed against defendants ML Mezzanine Inc., Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc.

. The treatment of expenses is not in dispute and will not be discussed further.

. Rudbart v North Jersey Dist. Water Supply Commn. (127 NJ 344, 605 A2d 681, cert denied sub nom. First Fid. Bank v Rudbart, 506 US 871 [1992]), cited by plaintiff, supports a contrary finding that an investor’s securities contract is not a contract of adhesion.

. Only Albert and Schoen testified at the trial. There was no testimony as to the role of the independent general partners of the Fund in the negotiations.

. Under the partnership agreement and the Investment Advisers Act of 1940 (15 USC § 806-5 [b] [3]), distributions to the investment advisor cannot exceed 20%. The Investment Advisers Act provides that performance-based distributions to an investment advisor cannot exceed 20% of realized capital gains upon the funds of the business development company over a specified period of time. Here, the partnership agreement ultimately limits the managing general partner’s incentive fee to 20%, however, that 20% is paid at an accelerated rate of 30% until the 20% maximum is attained.

. In June 1991, the Securities and Exchange Commission issued a release addressing problems of compliance with disclosure requirements applicable to initial public offerings of limited partnerships. (Limited Partnership Reorganizations and Public Offerings of Limited Partnership Interests, 49 SEC Docket 125, release No. 33-6900, release No. 34-29314 [1991 WL 286802 (SEC)].) In relevant part, the release noted that, "[ljegalistic, overly complex presentation and inattention to understandability often make the substance of the disclosure difficult to understand. Further, documents frequently contain 'boiler plate’ explanations that are imprecise and readily subject to differing interpretations. Disclosure of complex matters, such as compensation arrangements and partnership distributions, frequently is copied directly from the partnership and other agreements without any clear and concise explanation of the provisions.” (1991 WL 286802, 3.)

. On this issue the court does not rely on the "Performance Presentation Standards of the Association for Investment Management Research”, promulgated in 1993.

. In this discussion of "cumulative”, the court’s interpretation of the term "return” within "priority return” is assumed.

. "[T]he amount of cumulative, noncompounded return of 10% per annum on the average daily amount of the Gross Capital Contributions represented by Mezzanine Investments.”

. During the disputed period, there were no unrealized gains.

. This opinion has been edited for publication. Detailed calculations have been omitted.