NEW JERSEY STEEL CORPORATION,
Plaintiff,

v.

The BANK OF NEW YORK, Defendant.

No. Civ.A 95 CIV. 3071MP.

United States District Court,
S.D. New York.

June 5, 1998.

Jacobs Persinger & Parker, New York City (J. Michael Bayda and Debra E. Bodian, of counsel), for Plaintiff.

Hahn & Hessen, LLP, New York City, (Steven J. Mandelsberg and Maria A. Arnott, of counsel), for Defendant.

### OPINION AND DECISION

MILTON POLLACK, Senior District Judge.

### PRELIMINARY

A. The defendant The Bank of New York ("BNY"), pursuant to an Inter–Creditor Agreement, agreed with plaintiff, New Jersey Steel Corporation ("NJS"), to share with NJS the proceeds from the sale of all the assets of A.J. Ross Logistics, Inc. ("AJR") pledged by AJR to BNY as security for the indebtedness of AJR to BNY. The collateral securing the indebtedness consisted of all of the assets of AJR which were sold in 1994 in a bankruptcy sale for the bankrupt AJR, and the net proceeds were paid to BNY in 1994.

B. Demand was made by NJS for its agreed share, but payment has been refused. This suit for breach of contract followed.

C. BNY has counterclaimed and also asserted as a defense to the complaint that the contract claim of NJS should be equitably subordinated to claims of other creditors of AJR. NJS contends that such defense and counterclaim are devoid of legal and factual content, and are in any event inapplicable to a contract claim which does not involve claims in bankruptcy by either party and the outcome of which can have no effect on the bankruptcy estate. And, more particularly, that BNY has not proved any inequitable conduct on the part of NJS in its relations with AJR which would warrant application of that bankruptcy doctrine in any connection where it could validly be asserted.

D. A bench trial of this action was held before the Honorable Milton Pollack on May 11 and 12, 1998. During the course of the trial the Court received live testimony on behalf of the plaintiff from Paul Roik, plaintiff's former Vice President of Finance and Chief Financial Officer, and on behalf of the defendant from Peter D. Brady, Executive Vice President of BNY Financial Corporation, a wholly-owned subsidiary of BNY, and George Hristakis, an internal auditor for BNY.

### FINDINGS

1. A.J. Ross Logistics, Inc. ("AJR") was a publicly-owned steel rebar fabricator with a principal place of business located in Keasbey, New Jersey, and the plaintiff New Jersey Steel Corporation ("NJS") was the largest supplier of steel to AJR.

2. NJS, the plaintiff, is a Delaware Corporation having its principal place of business in Sayreville, New Jersey. NJS is a publicly-owned company which manufactures steel and steel products, principally steel rebar, which is used in the construction industry.

3. NJS was a one-third equity owner of AJR, having acquired its interest in AJR in or about September 1988 in exchange for forgiveness of debt in the amount of approximately $2 million.

4. Thomas Petrizzo ("Petrizzo") was a one-third equity owner of AJR and until June 1992 was President of AJR.

5. In 1991 and 1992, AJR was a major customer of NJS and NJS was the largest and most dominant supplier of inventory to AJR.

6. Defendant The Bank of New York ("BNY") is a New York Corporation which has its principal place of business in New York, New York and engaged in the business of banking.

7. In November 1988, BNY's predecessor-in-interest, Irving Trust Company, entered into a Loan and Security Agreement (the "Loan Agreement") and related financing agreements (collectively, the "Financing Agreements") with AJR pursuant to which BNY made loans and

advances to AJR and was granted a first-priority security interest in all of AJR's personalty, including all receivables, inventory, equipment and general intangibles. Those loans at one time were as high as $22 million.

8. Following BNY's merger with Irving Trust Company in 1989, BNY vice president Stephen V. Mangiante ("Mangiante") and BNY senior vice president Peter D. Brady ("Brady") assumed primary responsibility for the AJR loan account.

9. Under the Loan and Security Agreement with Irving Trust/BNY, the Bank was granted and perfected a first priority lien and/or security interest in substantially all of AJR's personal property, including without limitation all Receivables, Inventory, Equipment and General Intangibles.

10. In November 1990, AJR sold its Keasbey, New Jersey property to NJS for $16 million. AJR had been seeking a buyer for the property without success. AJR had obtained an appraisal of the property, reciting a value of approximately $15,500,000.

11. The sale agreements of the Keasbey property contained a two-year leaseback provision which provided for annual rent from AJR of $900,000 and $1 million in years one and two, respectively.

12. Five million dollars of the price obtained for the Keasbey property was used to pay an outstanding mortgage on the property and the balance was applied to reduce AJR's trade debt to NJS. The amount of rent on the leaseback was computed as a percentage of the sale price equal to the interest rate NJS was earning on its excess cash balances at the time (between 6 and 6½ %). The transaction was negotiated at arms-length at a time when NJS had no representation on AJR's Board of Directors and no voting rights with respect to its one-third equity interest in AJR, having given a proxy to AJR's President Petrizzo. Although no other buyer was willing to pay as much as the appraised value for the property, Petrizzo was able to take advantage of NJS's vulnerable position to obtain a premium for the property. NJS was vulnerable because all of AJR's property was pledged to BNY as security for BNY's loan. Once AJR sold the real property, it would have no assets left against which AJR might have recourse if AJR failed to pay its debt to NJS. The transaction reduced leverage and improved AJR's working capital. AJR stopped paying rent to NJS in June, 1993.

13. In 1991 and 1992, BNY sent field examiners to AJR's offices every three or four months to review its books and records. It was a standard auditing process. They reviewed cash receipts, cash disbursements, sales ledgers, receivables, inventory levels, payables, and the recorded rental payments from AJR to NJS. They were time-consuming audits, and could take from three to five weeks.

14. On or about January 27, 1992, BNY declared an Event of Default under the Loan and Security Agreement with AJR, citing, among other things, a significant deterioration in AJR's accounts receivable ageings and the lengthy unavailability of Petrizzo, because of health-related reasons.

15. In early 1992, BNY's officer in charge of the AJR account, Brady, asked Paul Roik ("Roik"), NJS's chief financial officer, to propose a business plan for AJR, and on April 8, 1992, representatives of BNY, AJR, and NJS met to discuss the possible need for additional funding of AJR.

16. After negotiations, it was agreed among BNY, AJR and NJS that (a) a new president be hired for AJR to replace Petrizzo, (b) two representatives of NJS would become members of the five-member Board of Directors of AJR, (c) a controller would be hired for AJR, and (d) AJR would divest itself of all of its lines of business except for rebar fabrication.

17. BNY agreed to that business plan and on June 8, 1992 entered into loan restructuring agreements among BNY, AJR and NJS, pursuant to which (a) BNY's revolving credit agreement with AJR was converted to a Term Loan, (b) NJS agreed that AJR's account payable to NJS for steel rebar and other products sold, in the amount of $4,700,000, would not be reduced except in limited circumstances specified in the loan restructuring agreements, (c) BNY agreed to extend up to an additional $425,000 in advances to AJR, and (d) NJS agreed to sell up to an additional $425,000 worth of products to AJR on credit. The June 1992 restructuring represented a sharing of risk between NJS and BNY.

18. As part of the restructure of AJR's debt in June, 1992, and its conversion into a Term Note, BNY obtained from Petrizzo, an unconditional guaranty of the payment when due, without any set-off or other deduction, of amounts payable pursuant to the Term Note, and he agreed to a broad waiver of any conditions with respect to any right or remedy which might be involved. As a further obligation of AJR, the agreement of June 8, 1992 required that BNY be named beneficiary of a key man policy of life insurance on the life of Petrizzo to assure BNY of receipt upon the death of Petrizzo of an amount not less than $5,000,000.

19. Subsequent to the June 1992 loan restructuring, AJR's accounts receivable continued to deteriorate.

20. On October 16, 1992, BNY, AJR and NJS entered into another set of restructuring agreements, including an Inter-Creditor Agreement between BNY and NJS. Prior to entering into the Inter-Creditor and other agreements in connection therewith, NJS had no security for the debts and obligations owing to it by AJR.

21. On October 16, 1992, BNY and AJR agreed that BNY was owed $4,830,000 on its Term Note from AJR. As of the same date, there was an aggregate unsecured outstanding balance owing from AJR to NJS in the amount of $5,300,000, which the parties agreed would not be reduced except in limited circumstances specified in the loan restructuring documents. These debts were confirmed in agreements made at that date among BNY, AJR and NJS.

22. By the Inter-Creditor Agreement, the parties agreed, among other things, that if NJS were to sell products to AJR on credit resulting in an increase in AJR's account payable to NJS, the increase would be secured by BNY's collateral, namely, AJR's inventory and accounts receivable. Upon the sale of any such collateral, the proceeds would be divided between BNY and NJS in accordance with a formula, which provided that if AJR's account payable to NJS had been increased by NJS by $1,000,000, the maximum amount payable to NJS from the sale of such collateral would be $750,000.

23. Subsequent to October 16, 1992, NJS shipped products to AJR on credit which resulted in an increase in AJR's account payable to NJS by more than $1,000,000.

24. On or about November 2, 1993, AJR filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. The case was subsequently converted to a case under Chapter 7 of the Bankruptcy Code.

25. At the time of the filing of the said petition, AJR owed BNY approximately $5,130,000.

26. At the time of the filing of the said petition, AJR's account payable to NJS for products sold to AJR on credit amounted to approximately $6,750,000.

27. NJS filed a Proof of Claim in the AJR bankruptcy for the approximate amount of $7,374,218. At that time, AJR owed a substantial amount to NJS for unpaid rent, in addition to its indebtedness for steel products sold to AJR on credit.

28. By order of the United States Bankruptcy Court for the District of New

Jersey dated June 13, 1994 (the "Sale Order") and on notice to NJS, AJR was authorized to and sold substantially all of its assets, free and clear of all liens, encumbrances and security interests to Barker Steel Company, Inc. ("Barker") for a price of $2,250,000 (the "Sale") and directed payment of net sales proceeds to BNY, pursuant to 11 U.S.C. §§ 363 and 365. After adjustments the said sale yielded net proceeds of $2,129,825, of which $103,981 was allocated to inventory, $447,500 was allocated to machinery and equipment and $1,578,344 was allocated to AJR's accounts receivable.

29. No creditor of AJR, other than BNY, received any part of the proceeds of the sale of all AJR's assets.

30. Through the date of sale of AJR's assets, the account payable by AJR to NJS for products sold to AJR subsequent to October 16, 1992 was not less than $1,000,000, in addition to the preexisting account payable of approximately $5,300,000.

31. On or about February 18, 1993, NJS received from AJR a check in the amount of $40,691.11; and on or about August 30, 1993, NJS received from AJR a check in the amount of $48,845.58. The said February check was in payment for products shipped to AJR from NJS's fabricating division in Bowie, Maryland in January, 1993, and the August check was apparently in payment for trailers purchased by AJR from the fabricating division. Sales of products from the fabricating division of NJS were occasionally made to AJR in emergency situations to cover shortages of inventory. The credit extended on these sales was in addition to the $1,000,000 credit extended for products sold to AJR by NJS's Sayreville facility. These payments did not represent receipts by NJS of collateral or proceeds thereof, did not operate to reduce AJR's account payable to NJS to below $5,300,000, and were not received in violation of any provision of the Inter-Creditor Agreement or related documents. Moreover, Brady, who was re-

sponsible for the AJR account, testified that whether purchases were made from the fabricating division as opposed to the Sayreville facility, made no difference to BNY, as long as the amounts payable did not exceed the $1,000,000 of payments that AJR was permitted to make to NJS (which they did not).

32. Barker leased only the largest building of the Keasbey facility. The rental arrangement made by Barker was four years after the rental arrangement made with AJR and was not part of a sale-leaseback arrangement providing a substantial benefit to the seller-lessee.

33. There is no provision, condition or representation by NJS to BNY in the Inter-Creditor agreement drawn by BNY's attorneys limiting or in any way affecting the rent to be paid to NJS for the lease-back of the Keasbey properties. Moreover, although the rent appeared in AJR's records and BNY's auditors had learned the amounts thereof within a few weeks in the course of their regular periodic audits of AJR, no comment or objection thereto was made by BNY, its auditors, or anyone else on its behalf with respect to the amount of the rent stipulated and paid. In 1992, at the time of the complete restructuring of the loan arrangements of AJR with BNY, BNY commented about the reasonableness of the rent that AJR was paying for the Keasbey property under lease to AJR. Brady, BNY's officer in charge, indicated that he believed the rent expense was a very large expense, but that BNY "didn't do any independent checking at all", explaining that "if we had made a real estate loan here . . . we would have documented exactly what the rent should have been. But since we did not make a real estate loan, we did not do it" even though "the rent was of significance." He explained further, "The rent was part of a business plan. . . . It was one expense among 20, or 30, or 40 expenses that were tied up in the business plan." BNY accepted and agreed to the business plan.

### DAMAGES

34. The Sale of AJR's assets produced $2,250,000 which, after adjustments, yielded net proceeds of $2,129,825. On the Bill of Sale, $103,981 was allocated to AJR's inventory, $447,500 was allocated to AJR's machinery and equipment, and $1,578,344 was allocated to AJR's accounts receivable. After expenses and proceeds deposited in escrow, BNY received $1,962,176 on June 14, 1994. Under the Inter–Creditor Agreement, BNY was accountable to NJS only for those amounts which represented AJR inventory and accounts receivable. Inventory and accounts receivable represented 78.99% of the Sale proceeds.

35. BNY received $130,128.36 on July 1995 from the portion of the Sale proceeds deposited in escrow. BNY received the following additional amounts collected from outstanding accounts receivable: [1]

    $1,650.00 — July 25, 1994
    1,245.69 — August 1, 1994
    330.37 — August 2, 1994
    6,365.34 — December 30, 1994
    **$9,591.40**

36. Paragraph 3 of the Inter–Creditor Agreement provides, in relevant part,

    "3. Following any Default Declaration and/or enforcement action, our respective entitlement in and to the proceeds [from the sale of AIR accounts receivable and inventory] shall be as follows . . .

    (a) We [BNY] shall be the first entitled to such proceeds to the full extent of all past due interest and all reasonable fees and charges under or in connection with our Agreements with AJR. You [NJS] shall thereafter be entitled to such proceeds to the extent of the lesser of: (i) the outstanding balance of your Supplemental NJS Facility; or (ii) $500,000, to be applied by you in reduction of the outstanding balance of such Supplemental NJS Facility; (b) The next proceeds shall be shared by us on a fifty percent/fifty percent (50/50) basis, provided that you shall not be entitled to and shall not receive in total under this sharing arrangement more than an additional $250,000 in total, or an aggregate amount of more than $750,000 in proceeds."

37. The "past due interest" accrued through June 14, 1994, deductible by BNY in accordance with paragraph 3(a) of the Inter–Creditor Agreement dated October 16, 1992 between BNY and New Jersey Steel Corporation, amounts to $579,272.24. The "fees and charges" incurred through February 28, 1995, deductible by BNY in accordance with paragraph 3(a) of the Inter–Creditor Agreement amounts to $164,666.09.

38. Thus, pursuant to the Inter–Creditor Agreement, the total owed to NJS under said agreement is computed as follows:

| Date BNY Received the Stipulated Sale Proceeds | | Amount |
|---|---|---|
| June 14, 1994 | $1,962,176.00 | |
| July 31, 1995 (received from escrow) | 130,128.36 | |
| | $2,092,304.36 | |
| | × 78.98888% | |
| | (percentage of inventory and accounts receivable based on amounts allocated in Bill of Sale) | $1,652,687.70 |
| July 25, 1994 (accounts receivable proceeds) | | 1,650.00 |

---

1. Pursuant to paragraph 4 of the Contract of Sale of AJR's assets (Ex. 9), the buyer agreed to attempt to collect certain outstanding accounts receivable and to pay a portion of the proceeds thereof to BNY as an additional purchase price.

| | |
|---|---:|
| August 1, 1994 (accounts receivable proceeds) | 1,245.69 |
| August 2, 1994 (accounts receivable proceeds) | 330.37 |
| December 30, 1994 (accounts receivable proceeds) | <u>6,365.34</u> |
| Total proceeds received by BNY | $1,662,279.10 |
| Minus fees and expenses | (164,666.09) |
| Minus interest | (579,272.24) |
| Proceeds thus available to pay NJS Claim | 918,340.90 |
| Minus first $500,00 to NJS per agreement | (500,000.00) |
| Balance to be shared "50/50" per agreement | <u>418,340.90</u> |

TOTAL THUS OWED TO NJS [¶ 3(a) ]
($500,000 plus 50% of $418,340.90)          **$709,170.45**

39. Defendant is not entitled to accrue any further interest for itself thereafter on the original loan to AJR, or expenses incurred thereafter, in determining the amount payable to NJS under the agreements between the parties.

40. NJS has demanded payment from BNY of the portion of the proceeds payable to NJS under the Inter–Creditor Agreement, but BNY has refused to pay any part thereof to NJS and this was a breach of that Agreement. Based on the formula specified in the Inter–Creditor Agreement, the amount payable to NJS by BNY from the proceeds of the sale of AJR's accounts receivable and inventory was $709,170.45.

### COUNTERCLAIM

41. There was no proof of the allegations of BNY in its defense or counterclaim that NJS attempted to influence business decisions made by the debtor. The proof was that NJS and BNY had jointly selected new management for the debtor; that NJS and BNY each had full access to the debtor's premises, personnel, records, accounting information and all business records, utilizing the same from at least 1991 to the period of the bankruptcy of AJR; and that neither BNY nor NJS had special access to the debtor's premises and personnel. NJS was not the AJR's sole source of financial support and NJS did not act as a joint venturer or prospective partner with AJR. There was no use of AJR by NJS as a mere instrumentality or alter ego of AJR.

42. BNY alone obtained and held the personal guarantee from the president of AJR, Petrizzo, of AJR's indebtedness to BNY; no similar guarantee of the debt to NJS from AJR was given. BNY kept a regular, careful scrutiny of the matters pertinent to the business of AJR both through its bank officers and inside auditors, as well as its outside auditors, and regularly received AJR's quarterly reports. In fact, BNY was the real, if not apparent, insider to the debtor through the provisions of its security, guarantee and life insurance arrangements with AJR and its President, Petrizzo.

43. The one-third equity interest of NJS in AJR had come to it through a trade for unpaid obligations of AJR to NJS and was a non-voting interest which turned out to have absolutely no monetary value for NJS. The circumstances about the acquisition by NJS of its one-third equity interest in AJR were explained by Roik as:

"Basically at that time A.J. Ross needed liquidity, and one of the conditions that apparently BNY [National State Bank] told A.J. Ross management was the fact

that they wanted to see an additional infusion of equity into the company ... what we decided to do was, in effect, reduce the receivables by $2 million and, in effect, turn that into equity, and in the process we received a one-third-interest in the company. That enabled them to get bank financing from national State ... that bank financing [was not] used to pay additional indebtedness to New Jersey Steel.

\* \* \* \* \* \*

"**Q:** What happened to New Jersey Steel's equity interest in A.J. Ross?

"**A:** It disappeared it was written off in bankruptcy."

44. At no time did NJS represent to BNY that the value of the rental for the Keasbey facility payable by AJR on the two-year leaseback to AJR of those facilities was the fair market value. The subject simply did not come up. Furthermore, the availability of the dock facilities, water access to the property and riparian rights were not afforded to Barker. Thus, its lease formed no basis of comparison with AJR's leaseback in 1990.

45. Roik testified that information concerning links of Petrizzo to organized crime and the seizure of AJR records by the FBI came to NJS' attention for the first time through newspaper articles in 1993. As a result of the newspaper articles, the NJS board of directors launched an investigation and review. Roik testified that neither Mangiante nor Brady told him that Petrizzo had alleged connections with organized crime; that Brady "indicated to [him] that he was very familiar with Tom Petrizzo and had heard of him in the New York construction industry." Roik testified on cross-examination:

"Mr. Bayda asked me about my knowledge of Petrizzo's mafia—alleged mafia affiliations, and I alluded to the fact that Peter Brady was familiar with Mr. Petrizzo and, in fact, BNY at some point had an exposure as high as $22 million."

\* \* \* \* \* \*

"he was familiar with Tom Petrizzo and the New York construction industry ... that is the comment Peter Brady made to me. He did not specifically say he was tied to the mafia."

Roik further testified on defendant's redirect examination:

"Typically, when a bank takes an exposure that large, they usually do a background check on the principals of the company, particularly in a case where you have a company that is owned 60% or so. So a lot of my confidence came from the fact that BNY of New York was lending A.J. Ross $22 million already."

The infusion of equity into AJR by NJS, Roik said, was because:

"I believe at some point Irving Trust Bank of New York had something like a $22 million loan exposure to A.J. Ross.... So a lot of my confidence came from the fact that BNY of New York was lending A.J. Ross $22 million already."

46. Inquiry further at the trial about BNY's extraordinary extension of credit was frustrated and shunted off by Brady. The Court asked for the internal accountant's work papers, but they were never brought in:

[**the Court**]: What happened to the credit files?

[**Mr. Brady**]: It may be with our attorneys. It may have been returned to us. I don't know at this point. I certainly can find out. BNY did not explain the circumstances under which it (or Irving Trust) granted the huge extension of credit to AJR when Petrizzo was its president. Brady did not contradict Roik's testimony thereon, nor did Brady reveal what BNY's credit files had in them about Petrizzo. Brady did indicate to Roik that he was very familiar with Petrizzo and that he had heard of him in the construction industry. But Brady did not respond to Roik's testimony that banks typically do a background check on the principals of a company like AJR

(or what it contained) when they take on an exposure that large. Brady did say that "we were cautioned to be careful in the construction industry", responding affirmatively to the question whether "you or people in the bank were pretty well aware of the chicanery going on" and "had to be on your guard." Brady made no explanation of why he obtained from Petrizzo in 1992 an extensive personal guarantee of BNY's indebtedness.

47. The proof failed to elicit any cognizable credible evidence of fraud, illegality or breach of fiduciary duties of NJS in its relations and business affairs with AJR. The undercapitalization of AJR was no part of the responsibility or action of NJS. There was no type of inequitable conduct attributable to NJS in the affairs of AJR adduced in the evidence.

48. BNY has not sufficiently, or even facially, stated or proved a claim for equitable subordination in bankruptcy of NJS's contract with BNY. The defendant's allegation that the plaintiff may have engaged in "deceit or misrepresentation" was not supported by any credible evidence and, under the facts and circumstances, was unfairly asserted in defendant's papers and without foundation in the record. In retrospect, BNY seemingly misled the Court in its earlier consideration of the case on a motion to dismiss the counterclaim. No credible evidence was adduced that there was inequitable conduct of NJS directed against the bankrupt, or its other creditors, or BNY, which would be cognizable or sufficient to warrant subordination of a contract claim of NJS against BNY. Plaintiff's claim in this case had already been subordinated to that of the defendant from long prior to the bankruptcy of AJR and plaintiff has not received any value or money either from the bankruptcy or under its contract with the defendant.

49. The issues of credibility herein are resolved in favor of the plaintiff and against the defendant.

## CONCLUSIONS

I. In an action for breach of contract, the complaining party must establish (1) the formation of the contract, (2) its performance of any dependent conditions or conditions precedent, (3) the other party's failure to perform its obligations under the agreement, and (4) resulting damage. *Republic Corp. v. Procedyne*, 401 F.Supp. 1061 (S.D.N.Y.1975). Here, the formation of the contract, BNY's refusal to perform, and the resulting damage were undisputed at trial. Solely at issue was NJS's alleged failure to comply with a specific condition of the Inter–Creditor Agreement that it not receive certain prohibited payments from AJR which would reduce AJR's pre-existing debt to NJS below $5,300,000. The payments received by NJS from AJR were not of the prohibited class. Rather, they were payments for products shipped to AJR and for trailers purchased by AJR; they did not represent receipts by NJS of collateral, or proceeds thereof, and did not operate to reduce AJR's account payable to NJS below $5,300,000.

II. BNY is obligated to NJS under the Inter–Creditor Agreement on July 31, 1995 for the amount of $709,170.45 payable to NJS with legal interest thereon of 9% (CPLR § 5004) from that date until the date of entry of judgment herein.

III. The seventh defense and counterclaim of BNY herein in its Answer to the Complaint are dismissed, defendant having failed to state a claim upon which relief can be granted. NJS is not asserting any claim in bankruptcy or to bankruptcy assets. This Court lacks jurisdiction to administer any such claim. The doctrine of equitable subordination is applicable and limited to a bankruptcy setting. *See Aetna Life Ins. Co. v. Danbury Square Assoc.*, 150 B.R. 544, 547 (Bankr.S.D.N.Y.1993) (noting that "[e]quitable subordination pursuant to 11 U.S.C. § 510(c) is a bankruptcy remedy peculiar to the equitable jurisdiction of the bankruptcy court and cannot be severed from, and exist independently of, a lien or claim which will not be determined in the bankruptcy court"); *In re Poughkeepsie Hotel Assoc. Joint Venture*, 132 B.R. 287, 292 (Bankr.S.D.N.Y.1991) (explaining that "[t]he notion of equitable

subordination, as embodied in Code § 510(c), is peculiar to bankruptcy law and an issue which can only be decided in a bankruptcy setting"); *In re The Drexel Burnham Lambert Group, Inc.,* No. 90B–10421, 1990 WL 302177 at *8, (Bankr.S.D.N.Y.1990) ("The Bankruptcy Court is ... the proper forum to determine whether certain claims should be subordinated"). Here, as there are no claims in bankruptcy to be administered or subordinated by the court and, indeed, no questions regarding claim subordination whatsoever, the issues of equitable subordination are irrelevant. The findings herein nonetheless dispose on the merits of any such matter presented herein. No inequitable conduct of NJS was established by the evidence. *See In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977).

IV. Judgment for NJS shall be entered herein accordingly.

The foregoing Preliminary Statement and Findings shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.