**In re FONTAINEBLEAU LAS VEGAS HOLDINGS, LLC, et al., Debtors.**

**Fontainebleau Las Vegas, LLC, Plaintiff,**

v.

**Bank of America, N.A., et al., Defendants.**

**No. 09–21879–CIV.**

United States District Court, S.D. Florida.

Aug. 26, 2009.

Jeffrey Ira Snyder, Scott Louis Baena, Bilzin Sumberg Baena Price & Axelrod, Miami, FL, David M. Friedman, Jed I. Bergman, Seth A. Moskowitz, Kasowitz Benson Torres & Friedman, New York, NY, for Plaintiff.

Craig Vincent Rasile, Kevin Michael Eckhardt, Hunton & Williams, Mark David Bloom, John Blair Hutton, III, Greenberg Traurig, Robert Gerald Fracasso, Jr., Shutts & Bowen, Harold Defore Moorefield, Jr., Stearns Weaver Miller Weissler Alhadeff & Sitterson, Miami, FL, Bradley J. Butwin, Daniel L. Cantor, Jonathan Rosenberg, William J. Sushon, O'Melveny & Myers LLP, David J. Woll, Justin S. Stern, Lisa H. Rubin, Thomas C. Rice,

**654**

Simpson Thacher & Bartlett LLP, Frederick D. Hyman, Jason I. Kirschner, Jean-Marie L. Atamian, Mayer Brown LLP, Anthony L. Paccione, Arthur S. Linker, Kenneth E. Noble, Katten Muchin Rosenman LLP, Aaron Rubinstein, W. Stewart Wallace, Kaye Scholer LLP, New York, NY, Arthur Halsey Rice, Rice Pugatch Robinson & Schiller, Fort Lauderdale, FL, Alvin S. Goldstein, Furr & Cohen, Boca Raton, FL, Peter J. Roberts, Shaw Gussis Fishman Flantz Wolfson & Towbin LLC, Chicago, IL, David Alan Rothstein, Lorenz Michel Pruss, Dimond Kaplan & Rothstein, Coconut Grove, FL, J. Michael Hennigan, Hennigan Bennett & Dorman LLP, Los Angeles, CA, for Defendants.

*ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT: DENYING MOTION FOR TURNOVER: GRANTING MOTION TO PERMIT DISCOVERY*

ALAN S. GOLD, District Judge.

This CAUSE is before the Court on Plaintiff's Motion for Partial Summary Judgment on Liability With Respect to the March 2 Notice of Borrowing; (B) an Order Directing the Turnover of Funds to the Debtors' Estate; and (C) Expedited Filing and Consideration of this Motion (the "Motion"), filed on June 9, 2009 in the adversary proceeding ("AP") 09–01621–

AJC before the United States Bankruptcy Court [AP DE 6].[1] The Motion is before me pursuant to my Order Granting Defendants' Motion for Withdrawal of Reference [DE 23] dated August 4, 2009. Prior to the withdrawal of reference, the Motion was fully briefed in the Bankruptcy Court and oral argument was heard by United States Bankruptcy Judge A. Jay Cristol on July 13, 2009.[2] Oral argument was also held before me on Tuesday, August 18, 2009. I have considered the parties' respective positions after careful review of the pleadings, the case files, and the relevant law. For reasons that I address more fully below, I deny Plaintiff's Motion for Partial Summary Judgment and Order Directing the Turnover of Funds on three grounds: (1) Defendants are legally correct in their interpretation of the Credit Agreement as a matter of law; (2) alternatively, Defendants' interpretation of the Credit Agreement is reasonable, warranting further discovery and extrinsic evidence; and (3) material issues of fact exist as to whether Defendants were excused from their obligations under the Credit Agreement.

**I. Background**

A. Undisputed Facts

In the Southern District of Florida, a party moving for summary judgment must

---

1. On August 14, 2009, the parties filed a Report Regarding Status of Mediation [DE 42], indicating that mediation was ongoing but that a potential resolution of all matters in dispute required additional time. At oral argument before me, I afforded the parties an opportunity to file a Joint Motion by Wednesday, August 26, 2009, to seek a delay of the entry of this Order to provide more time to continue their mediation discussions. As I have received no such motion, I proceed to enter the following Order.

2. On June 19, 2009, Bankruptcy Judge Cristol granted Plaintiffs Motion for a Scheduling Conference and Entry of Case Management

Order by setting an expedited schedule for briefing and argument on the Motion. [AP DE 57]. I construe Bankruptcy Judge Cristol's Order to have granted leave pursuant to Fed. R. Bankr.P. 9006(c) (2) for this Motion to be filed within twenty days from the commencement of the action. Fed. R. Bankr.P. 9006(c)(2) ("when an act is required or allowed to be done at or within a specified time ... the court for cause shown may in its discretion ... order the period reduced"); Fed. R. Bankr.P. 7056(a) ("[Summary judgment] motion may be filed at any time after 20 days have passed from the commencement of the action....").

submit a statement of undisputed facts. S.D. Fla. L.R. 7.5. If necessary, the non-moving party may file a concise statement of the material facts as to which it is contended there exists a genuine issue to be tried. *Id.* Each disputed and undisputed fact must be supported by specific evidence in the record, such as depositions, answers to interrogatories, admissions, and affidavits on file with the Court. *Id.* All facts set forth in the movant's statement which are supported by evidence in the record are deemed admitted unless controverted by the non-moving party. *Id.* After careful review of Plaintiffs Statement of Undisputed Facts, the Defendants' Statement in Opposition, Plaintiffs Counterstatement, and the evidentiary materials offered by both sides, I find the following facts relevant to the disposition of Plaintiff's Motion to be undisputed: [3]

### 1. The Credit Agreement and Disbursement Agreement

On June 9, 2009, Plaintiff Fontainebleau Las Vegas, LLC ("Fontainebleau" or the "Borrower") and other affiliated entities filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of Florida. On the same day, Fontainebleau commenced the instant adversary proceeding against Defendants, a group of banks with whom Fontainebleau had entered into a Credit Agreement ("Cr.Agr.") and Disbursement Agreement ("Disb.Agr.") on June 6, 2007 for loans to be used for the construction and development of a casino resort in Las Vegas, Nevada (the "Project"). Under the Credit Agreement and the Disbursement Agreement, a syndicate of lenders were to loan, contingent on a variety of conditions set forth in the parties' various agreements, funds under three credit facilities, the Term Loan, the Delay Draw Term Loan, and the Revolving Loan facilities. [Cr. Agr. § 2.1]. Each facility respectively provided for a total commitment of $700 million, $350 million, and $800 million, with the Revolving Loan facility permitted re-borrowing.[4] [Cr. Agr. § 1.1, pp. 22, 38, § 2.1(c)]. Defendants in this case are those banks that have agreed to lend money under the Revolving Loan facility (the "Revolver Banks").[5] Bank of America, N.A., in addition to being one of the Revolver Banks, was the Administrative Agent for all loans made under the Credit Agreement and the Disbursement Agreement, among other loan documents. [Cr. Agr. p. 1, 26].

---

3. Plaintiff has incorporated its Statement of Undisputed Facts in the Motion [AP DE 6], Defendants have filed their Statement of Material Facts In Opposition to Plaintiff's Statement [AP DE 89], to which Plaintiff has filed a corresponding Counterstatement [AP DE 111]. The parties further rely on the terms of their Credit Agreement and Disbursement Agreement with each other. Plaintiff further relies on, among other materials, the affidavit of James A. Freeman, Senior Vice–President and Chief Financial Officer of Fontainebleau Resorts, LLC. Defendants rely principally on the affidavit of Henry Yu, Senior Vice–President of Bank of America and a member of the bank's Special Assets Group and Robert W. Barone, Senior Vice–President and Principal of Inspection and Valuation International, Inc. ("IVI"), who was retained by Bank of America to serve as a construction consultant to oversee construction of the Project [AP DE 97]. The parties further rely on correspondence exchanged between the parties in March and April 2009.

4. The Project was also financed by $675 million in second-mortgage notes, along with separate financing for development of the Project's retail space. SUF, ¶ 6.

5. The Defendants in this action are Bank of America, N.A., Merrill Lynch Capital Corporation, JP Morgan Chase Bank, N.A., Barclays Bank PLC, Deutsche Bank Trust Company Americas, The Royal Bank of Scotland PLC, Sumitomo Mitsui Banking Corporation, Bank of Scotland PLC, HSH Nordbank AG (New York Branch), and MB Financial Bank, N.A.

The Initial Term Loan of $700 million was funded in full upon execution of the Credit Agreement. [Freeman Aff. ¶ 11]. With respect to loans under the Delay Draw Term Loan and Revolving Loan facilities, the agreements provide for a two-step borrowing process. [*Id.* at ¶ 16]. First, per the Credit Agreement, the Borrower submits a Notice of Borrowing to the Administrative Agent. [Cr. Agr. § 2.4(a)]. Upon receipt of the Notice of Borrowing, the Administrative Agent is required to promptly notify "each Delay Draw Lender and/or Revolving Lender, as appropriate," that the Notice has been received. [*Id.* at § 2.4(b)]. After the respective lenders have been notified, they "will make the amount of its pro rata share of each borrowing available to Administrative Agent ... prior to 10:00 am on the Borrowing Date," which is typically the next business day. [*Id.*] "Upon satisfaction or waiver of the applicable conditions precedent specified in Section 2.1, the proceeds of the loans will be made available by the Administrative Agent, in like funds as received by Administrative Agent from the Lenders, not later than noon on the Borrowing Date." [*Id.* at § 2.4(c)]. These loans are remitted to the Bank Proceeds Account. *Id.* As a second step, Fontainebleau is required to fulfill certain conditions set forth in the Disbursement Agreement, including the submission of an "Advance Request" and the satisfaction of an "In–Balance Test," at which point the money is moved to various Funding and Payment Accounts for disbursement to Fontainebleau. [*Id.;* Disb. Agr. § 2.1.1, 2.2.1]

## 2. Borrowing of Loans Under the Agreements

As discussed above, the Initial Term Loan of $700 million was funded in full upon execution of the Credit Agreement. [Freeman Aff. ¶ 11]. On February 24, 2009, a $68 million loan was borrowed under the Revolving Loan facility. [Yu Aff. ¶ 17]. A further $13.5 million in letters of credit, also under the Revolving Loan facility, was also outstanding. [*Id.* at ¶ 17]. On March 2, 2009, Fontainebleau submitted a Notice of Borrowing (the "March 2 Notice"). As confirmed at oral argument by Plaintiff's counsel, until the March 2 Notice, Fontainebleau had not borrowed any funds under the Delay Draw Term Loan. [DE 56 at 12]. The March 2 Notice, which was amended on March 3, 2009, sought to borrow all available loans under the Delay Draw Term Loan and facilities, which consisted of $350 million under the Delay Draw Term Loan facility and $656.5 million Revolving Loan facility.[6] [Freeman Aff. ¶¶ 29, 36, Ex. C, E]. This Notice, which sought a total of over $1 billion in loans, was denied by the Administrative Agent on March 3, 2009, based on its view that the Notice did not conform to the requirements of section 2.1(c)(iii) of the Credit Agreement. [*Id.,* Ex. D]. Section 2.1(c)(iii) provides:

[U]nless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000.

A revised Notice of Borrowing submitted on March 9, 2009 (the "March 9 Notice") seeking only the $350 million under the Delay Draw Term Loan facility was

---

**6.** The remaining $143.5 million of the $800 million Revolving Loan facility could not be borrowed because the $68 million loan and $13.5 million in letters of credit referenced above were already outstanding, and the parties had separately agreed that $62 million of the Revolving Loan facility was not to be drawn until completion of the Project. [Freeman Aff. ¶ 29].

approved by Administrative Agent, which on March 10, 2009 remitted $326.7 million under the Delay Draw facility to the Bank Proceeds Account.[7] [*Id.* at ¶ 43, Ex. G]. The Delay Draw loan repaid the outstanding $68 million Revolving loan; per the Credit Agreement, "[t]he proceeds of each Delayed Draw Term Loan will be applied *first* to repay in full any then outstanding Revolving Loans and Swing Line Loans and *second,* to the extent of any excess, be credited to the Bank Proceeds Account". [Cr. Agr. § 2.1(b)(iii) ]. As a result of subsequent additional funding, the amount of loans made under the Delay Draw Term Loan facility ultimately came to $336.7 million. [Freeman Aff. ¶ 12].

The parties engaged in a series of correspondence and meetings in March and April 2009. On April 13, 2009, Fontainebleau sent a Notice to Bank of America, among others, informing Bank of America that "one or more events, occurrences or circumstances have occurred which reasonably could be expected to cause the In–Balance Test to fail to be satisfied...." [Yu Aff., Ex. 24]. Thereafter, the Revolver Banks terminated their commitments under the Credit Agreement on April 20, 2009 on the basis that "one or more Events of Default" had occurred. [*Id.*, Ex. 26]. Consequently, at this point in time, besides the Initial Term Loan, only $336.7 million under the Delay Draw facility and $13.5 million in letters of credit under the Revolving Loan facility have been funded under the Credit Agreement. [Freeman Aff. ¶¶ 12, 13].

### B. Related Action

A related action was commenced on June 6, 2009 in the United States District Court for the District of Nevada by a group of lenders under the Term Loan and Delay Draw Term Loan facilities (the "Term Lenders") against the Revolver Banks [DE 1–2, at 11] (the "Term Lender Action"). This complaint, since amended, alleges that they have been damaged by the conduct of the Revolver Banks under two theories: one, that the Revolver Banks breached the Credit Agreement by failing to honor the March 2 Notice and the April 21 Notice, thereby derailing the Project and reducing the amount and value of Term Lenders' collateral, and second, that despite knowledge of Fontainebleau's imminent default, Bank of America, approved the March 9 Notice, and in its capacity as Disbursement Agent under the Disbursement Agreement, approved a Match 25, 2009 Advance Request that caused approximately $133 million of the Delay Draw Term Loans to be disbursed from the Bank Proceeds Account. [DE 30–2]. The Term Lenders were granted leave to file an *amicus curiae* brief [DE 26–2], to which Defendants filed a Response [DE 45].

### C. The Parties' Positions and Relief Sought

The central issue presented by this Motion is whether Defendants breached the Credit Agreement by refusing to process the March 2 Notice, which requested Revolving Loans in excess of $150 million, on the basis that the Total Delay Draw Commitments, i.e. $350 million, was not "fully drawn" as required by the terms of section 2.1(c)(iii). Plaintiff argues that the March 2 Notice, which simultaneously requested $656.5 million in Revolving Loans with all funds available under the Delay Draw Term Loan facility, satisfied the requirement that the Delay Draw Term Loan

---

**7.** According to Fontainebleau, the shortfall of $23.3 million was due to two term lenders in default and an unfunded commitment from First National Bank of Nevada ("FNBN"), which was in FDIC receivership.

facility be "fully drawn," because the Delay Draw Term Loans had been fully *requested* by the time funds in excess of $150 million under Revolving Loan facility were sought. As a result, Plaintiff seeks in this Motion a ruling that that Defendants breached the unambiguous terms of the Credit Agreement when they failed to honor the March 2 Notice.[8] Pursuant to such relief, Plaintiff further seeks the turnover of the $656.6 million requested under the Revolving Loan facility to the bankruptcy estate, pursuant to 11 U.S.C. § 542(b) ("[A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee. . . .").

Defendants, on the other hand, contend that section 2.1(c)(iii) could only be satisfied if all Delay Draw Term Loans were first *fully funded* prior to a demand for Revolving Loans over $150 million, which meant that Fontainebleau could not make a simultaneous request of loans under those two facilities, a position Defendants adopted on March 3, 2009 when the Notice was rejected. Defendants further argue that even if Plaintiff's interpretation was correct, they were under no obligation to honor the March 2 Notice because Fontainebleau was already in breach of the

Credit Agreement at that time. Defendants incorporate into their Response to opposing the Motion for Partial Summary Judgment two Cross–Motions, the first to Dismiss the Turnover Claim, and the second to Deny or Continue Fontainebleau's Motion to Permit Discovery.[9]

## II. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim. *See id.* ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S.Ct.

---

**8.** At oral argument before the Bankruptcy Court, counsel for Plaintiff clarified that it was not seeking the disbursement of loans under the March 2 Notice, but simply for the loans to be made to the Bank Proceeds Account. Plaintiff conceded there were contested issues of fact as to getting the loans into the Resort Payment Account, one of the payment accounts for payment of Project costs. [AP DE 140, 16].

**9.** The Motion to Deny or Continue Fontainebleau's Motion to Permit Discovery is made pursuant to Fed.R.Civ.P. 56(f), which provides, "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposi-

tion, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." As Plaintiff has moved for partial summary judgment at such an early stage of this proceeding, there has been no opportunity for discovery between the two sides. Nevertheless, a court may grant summary judgment without the parties having conducted discovery if the opponent has not sought discovery by making a motion under Rule 56(f), or if the court has, in the valid exercise of its discretion, denied such a motion. *Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841, 844 (11th Cir.1989).

2505; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir.2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir.2001).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. *Denney*, 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## III. Discussion

This dispute turns on the interpretation of the term "fully drawn" and whether Fontainebleau's alleged default excused Defendants from honoring the March 2 Notice.[10] In reaching the conclusion that partial summary judgment must be denied, I discuss first the reasons why the term "fully drawn" is unambiguous as used in section 2.1(c)(iii) and means "fully funded." I next address why even if this legal conclusion is erroneous, I conclude that Plaintiff's interpretation is at best a reasonable, but not conclusive one, and that the resulting ambiguity requires denial of partial summary judgment. Finally, I proceed to discuss why even if Plaintiffs interpretation of the term "fully drawn" is correct, Defendants' purported default provided an adequate basis for Defendants to reject the March 2 Notice.

**A. The meaning of the term "fully drawn" as a matter of law**

**1. The unambiguous meaning of "fully drawn" is fully funded**

Under New York law, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (N.Y.2002). Whether an agreement is ambiguous is a question of law for the courts and determined by looking within the four corners of the document, not to outside sources. *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (N.Y.1998). In determining whether the meaning of a term is ambiguous, the court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. *Id.* The court should further construe such terms in accordance with the parties' intent, which is generally discerned from the four corners of the document itself. *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 884 N.Y.S.2d 211, 912 N.E.2d 43 (2009); *Zullo v. Varley*, 57 A.D.3d 536, 868 N.Y.S.2d 290 (N.Y.App.Div.2008) (construction of a contract should give fair

---

**10.** New York law governs the interpretation of the Credit Agreement. [Cr. Agr. § 10.11].

meaning to all of the language employed by the parties, to reach a practical interpretation of the parties' expressions so that their reasonable expectations will be realized).

▉ Plaintiff asserts that under the undisputed facts of this case, the unambiguous meaning of "fully drawn" is "fully requested." I disagree, and am persuaded by Defendants' argument that in context of the entire agreement, the unambiguous meaning of "fully drawn" in section 2.1(c)(iii) means "fully funded." The structure of the lending facilities, as discerned from the Credit Agreement itself, reflects the parties' intent to employ a sequential borrowing and lending process that places access to Delay Draw Term Loans ahead of Revolving Loans when the amount sought under the Revolving Loan facility was in excess of $150 million. The most persuasive interpretive approach is to read section 2.1(b), which governs Delay Draw Term Loans, and section 2.1(c), which governs Revolving Loans, together. Section 2.1(b)(iii) provides that "[t]he *proceeds* of each Delay Draw Term Loan will be applied *first* to *repay in full any then outstanding Revolving Loans* and Swing Line Loans and *second,* to the extent of any excess, be credited to the Bank Proceeds Account" (underline in original, emphasis added). By its terms, the Credit Agreement requires that proceeds of a Delay Draw Term Loan, in other words, money that is actually made available to the Borrower, must first be used to repay in full outstanding Revolving Loans. Consistent with the obligation to ensure repayment in full, section 2.1(b)(i) sets the minimum Delay Draw Term Loan that can be borrowed at $150 million, the limit under which funds can be borrowed "freely" under the Revolving Loan facility without conditions

associated with the Delay Draw Loans. Such a structure ensures that the Delay Draw Term Loan would be sufficient to repay any outstanding Revolving Loans. Permitting a simultaneous request that seeks a Revolving Loan in excess of $150 million, such as the March 2 Notice, is therefore not valid because the Delay Drawn Term Loan could not repay in full the outstanding Revolving Loan, which under the March 2 Notice would have been in excess of $700 million.[11] Therefore, In order for section 2.1(b)(iii) to be given effect, all of the proceeds from the Delay Draw facility must *first* be made available and used to repay outstanding Revolving Loans, which would be under $150 million, before the rest of the Revolving Loan facility could be made available. *Zullo,* 868 N.Y.S.2d at 291 (a court should not adopt an interpretation which would leave any provision without force and effect) (citations omitted). Accordingly, "fully drawn" must mean "fully funded."

Plaintiff does not effectively rebut this reasoning, but rather argues that the Credit Agreement was not intended to shift the lending risk on the various Term Lenders to such a large degree. Plaintiff argues that Defendants' interpretation is not commercially reasonable where Revolver Banks can be relieved of any obligation to make available the vast majority of the Revolving Loan facility even if one Delay Draw Term lender fails to provide its *pro rata* share, as was the case here. In support, Plaintiff points to section 2.23(g), which provides that "the obligations of the Lenders to make Term Loans and Revolving Loans ... are several and not joint. The failure of any Lender to make any Loan ... shall not relieve any other Lender of its corresponding obligation to do so ... and no Lender shall be

---

**11.** The outstanding amount of Revolving Loans would have been the sum of the $656.5 million requested and the $68 million that was already outstanding.

responsible for the failure of any other Lender to so make its Loan. . . ." In other words, Plaintiff suggests that Defendants' interpretation effectively subjects Plaintiff's ability to secure financing for the Project to the mercy of any one lender who fails to fund a loan, especially where no other bank is obligated to fill a financing gap. In entering into this Credit Agreement, however, the various Delay Draw lenders were cognizant of the terms of section 2.23(g) and that the agreement did not impose any shared obligations on lenders to ensure the absence of a financing gap. Indeed, section 9.7 of the Credit Agreement provides that "[e]ach Lender . . . also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender . . . continue to make its own decisions in taking or not taking action under or based upon this Agreement."[12] The terms of the Agreement make clear the risks concerning potentially large financing gaps; such a risk cannot now be used by Plaintiff to support a conclusion that Defendants' interpretation is commercially unreasonable. Accordingly, because the unambiguous meaning of "fully drawn" is consistent with Defendants' interpretation, partial summary judgment in favor of Plaintiff must be denied.

2. The term "fully drawn" can reasonably be interpreted to mean "fully funded"

■■■ As previously stated, even if my conclusion that "fully drawn" unambiguously means "fully funded" is in error, I conclude that Plaintiff's reasoning at best suggests that its interpretation is a reasonable one, but not the conclusive one, and requires the denial of partial summary judgment. Existence of ambiguity is determined by examining the entire contract and considering the relation of the parties and the circumstances under which it was executed, with the wording to be considered in the light of the obligation as a whole and the intention of the parties as manifested thereby. *Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 869 N.Y.S.2d 511 (N.Y.App.Div.2008). Contract language is ambiguous when it is reasonably susceptible of more than one interpretation, and extrinsic or parol evidence may be then permitted to determine the parties' intent as to the meaning of that language. *Fernandez v. Price*, 63 A.D.3d 672, 880 N.Y.S.2d 169, 173 (N.Y.App.Div.2009). Such extrinsic evidence can include all prior dealings of the parties, conversations, negotiations and agreements made prior to or contemporaneously with contract and relating to its subject matter, the purpose or object of the contract or a specific provision, industry custom and usage, as well as the parties' subsequent conduct. *Alternatives Fed. Credit Union v. Olbios, LLC*, 14 A.D.3d 779, 787 N.Y.S.2d 508 (N.Y.App. Div.2005); *Kenneth D. Laub & Co., Inc. v. 101 Park Ave. Assoc.*, 162 A.D.2d 294, 556 N.Y.S.2d 881 (N.Y.App.Div.1990); *Winston v. Mezzanine Investments, L.P.*, 170 Misc.2d 241, 648 N.Y.S.2d 493, 499 (N.Y.Sup.1996).[13] Here, Defendants have

---

**12.** Plaintiff contend that the Term Lenders are all in agreement with its interpretation that "fully drawn" means "fully requested." Defendants in rebuttal argue that despite the Lenders' independent obligations under section 2.23(g) and each Lender's express commitment to make its own decisions pursuant to section 9.7, every Lender agreed with the conclusion reached on March 3, 2009 by Bank of America, as Administrative Agent, not to process the March 2 Notice on the basis of non-compliance with section 2.1(c)(iii).

**13.** New York courts have also held that any ambiguity in contract language is to be construed against party that drafted the contract, "but is a rule of construction that should be employed only *as a last resort.*" *Fernandez v.*

advanced sufficient genuine issues of material fact to suggest that their interpretation is also reasonable, thereby precluding partial summary judgment.

Plaintiff argues that its interpretation is the only reasonable one by pointing to the use of the term "fully drawn" in section 2.1(c)(iii) as opposed to the term "disbursed" or "outstanding," which are used consistently throughout the Credit Agreement to mean "funded."[14] By using the term "fully drawn," Plaintiff argues it must mean something other than fully funded. [AP DE 109, p. 23]. The word "outstanding," however, has a distinct meaning. In repeated instances, the word "outstanding" appears in the phrase "then outstanding," which I read to refer the amount of a loan that is owing at a given moment in time.[15] For example, the definitions contained in section 1.1 provides that "Total Revolving Commitment' means at any time, the aggregate amount of the Revolving Commitments *then in effect*" (emphasis added) and " 'Aggregate Exposure' means … the amount of such Lender's Delay Draw Commitment *then in effect* or, if the Delay Draw Commitments have been terminated, the amount of such Lender's Delay Draw Term Loans *then outstanding …* ". A loan may therefore be outstanding, i.e. encumbered, or due and owing, despite having *previously* been "drawn" and repaid. This use of the word "outstanding" squarely supports the reasonable interpretation that "fully drawn" means "fully funded" as to loans under the

Delay Draw facility, inclusive but not limited to those amounts that are due and owing or then in effect.

Further, even assuming "fully drawn" must mean something other than "disbursed" or "outstanding," it does not follow that the term must mean "requested." Indeed, as the two-step sequential borrowing process indicates, "drawn" may reasonably refer to the requirement that Delay Draw Term Loans have been fully made to the Bank Proceeds Account before Plaintiff can seek an aggregate outstanding amount of Revolving Loans in excess of $150 million. Such an interpretation would be consistent with language in section 2.1(b)(ii), which references the disbursement of funds already in the Second Mortgage Proceeds Account for use by the Borrower. Accordingly, it is reasonable to interpret "fully drawn" within the context of section 2.1(c)(iii) as meaning more than merely the act of requesting funds.

Plaintiff's reliance on the purported dictionary meaning of the verb "draw" is also unhelpful to establish the unambiguous meaning of "fully drawn." Although dictionaries do not separately define "drawn," other than noting it is the past participle of the verb "draw," it is important to note that the word "drawn" is in the past tense and accompanied by the word "fully." This construction lends weight to those dictionary definitions that suggest "draw" means to "fund." For example, Black's Law Dictionary informs us that the verb

---

*Price*, 63 A.D.3d 672, 880 N.Y.S.2d 169, 173 (N.Y.App.Div.2009) (emphasis added).

**14.** As quoted above, section 2.1(c)(iii) uses the word "outstanding" to describe the Revolving Loan. Section 2.1(b)(ii) further provides "no Delay Draw Term Loans shall be made prior to the date upon which the entire amount on deposit in the Second Mortgage Proceeds Account is *disbursed*" (emphasis added).

**15.** Defendants argue that "outstanding" needs to be used in section 2.1(c)(iii) to refer to Revolving Loans because they have a unique re-borrowing feature. [Cr. Agr. § 2.1(c) (Revolving Loans may be borrowed and repaid, and subsequently reborrowed)]. However, Plaintiff persuasively points out that the word "outstanding" is used elsewhere in the Agreement to refer to Delay Draw Term Loans and Initial Term Loans.

"draw" means "to take out (money) from a bank, treasury, or depository." Merriam–Webster's Dictionary defines the word as "to take (money) from a place of deposit." The Merriam–Webster Dictionary, 2005. These definitions show that the term "fully drawn" can reasonably be interpreted to mean "fully funded."

Plaintiff further endeavors to support its argument that "drawn" unambiguously means "requested" by pointing to the use of the word in other provisions of the Credit Agreement and related documents, arguing that under new York law, a word used in one portion of a contract is presumed to have the same meaning when it is used in another portion of the contract. *Cohanzick Partners, LP. v. FTM Media, Inc.,* 120 F.Supp.2d 352, 359 (S.D.N.Y. 2000); *Reefer & Gen. Shipping Co., Inc. v. Great White Fleet, Ltd.,* 922 F.Supp. 935, 940 (S.D.N.Y.1996). Plaintiff's examples are unpersuasive, and at best create an ambiguity. For example, section 3.3(a) refers to "notice of a drawing" that triggers an obligation to make payment under letters of credit. However, the noun "drawing" is not the same as term "fully drawn." Indeed, the only other place in the Agreement that uses the phrase "fully drawn" is in section 8 of the Agreement, which provides that unused portions of certain funds in a cash collateral account be used after "all [ ] Letters of Credit shall have expired or been *fully drawn* upon," (emphasis add-

ed), which supports Defendants' interpretation that "fully drawn" means "fully funded." Section 3.3 further refers to the Revolver Banks' obligations to "reimburse the Issuing Lender for any amount drawn under any Letter of Credit." Therefore, the examples offered by Plaintiff establish at best an ambiguity as to the meaning of "fully drawn." In recognition such ambiguity here, different interpretive approaches, including the consideration of extrinsic evidence, should be relied on instead to divine the meaning of "fully drawn" as used in section 2.1(c)(iii).[16] Because Plaintiff has only shown that its interpretation of "fully drawn" is at most reasonable but not conclusive, partial summary judgment must be denied.

### B. The requirement that Fontainebleau not be in default

▮ Even if Plaintiff is correct that the term "fully drawn" unambiguously means "fully requested," I am persuaded by Defendants' arguments that they were entitled to reject the March 2 Notice on the basis of Plaintiffs default. Plaintiffs central argument that Defendants cannot do so is that the making of loans to the Bank Proceeds Account is not contingent on the absence of default. Plaintiff relies on language in section 2.1(c) that provides,

> "The making of Revolving Loans . . . to the Bank Proceeds Account shall be sub-

---

**16.** At oral argument, one piece of extrinsic evidence that had been the extensive subject of the parties' attention is a March 23, 2009 letter from Bank of America to "Fontainebleau Las Vegas Lenders." [Berman Aff., Ex. D]. The letter states, in context of $326.7 million having been funded under the March 9 Notice, that "[t]here is a divergence in opinions as to the reading of 2.1(c) (iii) of the Credit Agreement. Bank of America's position is that since the Borrower has requested all of the Delay Draw Term Loans, and almost all of the loans have funded . . ., Section 2.1(c)(iii) now permits the Borrower to request Revolving Loans which result in the aggregate amount outstanding under the Revolving Commitments being in excess of $150,000,000." The letter further states that "Bank of America's position is that it is willing to include the [shortfall] for the March 25 Advance, pending further information about whether these lenders will fund." Such extrinsic evidence illustrates the type of evidence that can further shed light on the parties' intentions.

ject **only** to the fulfillment of the applicable conditions set forth in Section 5.2." [Cr. Agr. § 2.1(c) ] (bold in original). Section 5.2 in turn provides, in pertinent part,

The agreement of each Lender to make [loans] is subject only to the satisfaction of the following conditions precedent: (a) Borrowers shall have submitted a Notice of Borrowing specifying the amount and Type of the Loans requested, and *the making thereof shall be in compliance with the applicable provisions of Section 2 of this Agreement.*

[Cr. Agr. § 5.2(a) ] (emphasis added). Plaintiff focuses only on the first clause of section 5.2(a), but ignore the second clause, which permits loans to be moved to the Bank Proceeds Account only if there is compliance with "applicable provisions of Section 2" of the Credit Agreement. A review of section 2.1(c), which applies to the making of Revolving Loans, indicates that the making of such loans is "[s]ubject to the terms and conditions hereof, and in reliance upon the applicable representations and warranties set forth herein and in the Disbursement Agreement." [17] Consequently, while there word "only" is emphasized in section 2.1 as one of only two terms that are in boldface in the entire Credit Agreement, by the plain language of the relevant provisions, the word "only" is intended to make clear that other than applicable provisions of sections 2 and 5.2 of the Credit Agreement, no other provisions shall control the Revolver Bank's obligation to make their share of the loans to the Bank Proceeds Account. It cannot be read to disregard the requirement that the terms and conditions set forth in the Credit Agreement and representations and warranties under the Credit Agreement and Disbursement Agreement be satisfied.

In short, each Revolver Bank had the specified right to ascertain if there was such compliance before making a Revolving Loan, including the representation that Fontainebleau was not in default. [Disb. Agr. §§ 3.3.3, 4.9]; *see Merritt Hill Vineyards Incorporated v. Windy Heights Vineyard, Inc.,* 61 N.Y.2d 106, 113, 472 N.Y.S.2d 592, 460 N.E.2d 1077 (N.Y.1984) (a contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned); *N.J. Steel Corp. v. Bank of N.Y.,* 223 B.R. 406, 414 (S.D.N.Y.1998) (requiring party claiming breach of contract to have performed any dependent conditions or conditions precedent). Defendants were therefore free to terminate their loan commitments if representations and warranties were determined to be false. [Disb. Agr. § 2.5.1(H); Cr. Agr. §§ 2.4(e), 8(b) ].

Plaintiffs argument that the making of loans to the Bank Proceeds Account is essentially automatic provided a Notice of Borrowing is submitted is contrary to the plain terms of the Credit Agreement. Plaintiff argues that other portions of the Agreement reflect the absence of the parties' intent to impose the requirement of a "no-default" representation to a Notice of Borrowing, pointing to the treatment of "Direct Loans" as compared to the "Disbursement Agreement Loans" of the type at issue here. Nonetheless, I conclude that Plaintiff has not carried its burden, in light of the plain terms of sections 5.2 and 2.1(c), to show that the Credit Agreement unambiguously rejects Defendants' right to rely on the accuracy of a no-default representation in connection with their obligation to honor a Notice of Borrowing.[18]

---

**17.** As conceded by Plaintiff's counsel at oral argument before Bankruptcy Judge Cristol, "hereof" is in reference to the Credit Agreement. [DE 140, p. 13].

**18.** Plaintiff argues strenuously that the agree-

■ As a reasonable interpretation of the Credit Agreement permits Revolver Banks to rely on such a representation, the next question is whether there is a genuine issue of material fact as to whether Borrower was in default as of March 3, 2009. The record plainly demonstrates such genuine issues of fact exist. Defendants have established a genuine issue of fact as to whether as of the submission of the March 2 Notice, representations concerning Fontainebleau's compliance with the "In–Balance Test" were inaccurate because they failed to reflect the construction costs that were being incurred on an ongoing basis.[19] Plaintiff noted at oral argument before Bankruptcy Judge Cristol that it vigorously disagreed with Defendants on the issue of past defaults, but Plaintiffs brief fails to seriously contest this point, relying principally instead on the argument that any falsity of representations as to default is immaterial as to Defendants' obligation to honor the March 2 Notice, which was addressed and discounted above.

■ The final argument Plaintiff advances regarding its purported default is that even if it had been in default, Defendants did not discover this fact until after March 3, 2009, when the March 2 Notice was rejected, and that discovery of the default at a later point in time cannot excuse Defendants' earlier obligation to make the loan.[20] In support, Plaintiff points to section 8(b) of the Agreement, which provides that loan commitments are terminated if "any representation or warranty ... shall prove to have been inaccurate in any material respect...." Plaintiff argues that this provision entitles Defendants only to prospective relief and not retroactive relief, but the basis for this argument is unclear. By the terms of section 8, if Defendants discover any representations that were materially inaccurate, they are entitled to "exercise any and all remedies available ... under applicable law, in equity or otherwise...." [Cr. Agr., p. 117]. Such encompassing language can reasonably be read to permit retroactive relief.[21] *College Point Boat*

ments do not contemplate that an Advance Request containing various representations and warranties needed for loans to be disbursed be required for the making of loans to the Bank Proceeds Account. By its terms, section 2.1(c) simply permits Revolver Banks to rely on existing representations and warranties in determining whether to make loans; it does not impose an affirmative obligation on the Borrower to make those representations warranties in connection with a Notice of Borrowing.

19. Defendants assert, and Plaintiff does not effectively controvert, that Plaintiff's February 13, 2009 Advance Request noted an in-balance cushion of $115 million at the end of January 2009, that the in-balance cushion as of February 28, 2009 had decreased to $42 million, and the cushion had further decreased to $14 million by March 25, 2009. [Yu Aff., Ex. 2, 17, 23]. On April 14, 2009, Fontainebleau acknowledged that the Project was out of balance by over $180 million. [*Id.*, Ex. 25]. A report by IVI noted that the earlier in-balance calculations did not include claims made by subcontractors as far back as a year. [Barone Aff., Ex. 6 at 19–20].

20. Defendants concede that as of March 3, 2009, they were not aware that Plaintiff may have been in default. At oral argument before me, counsel for Defendants JP Morgan Chase Bank, N.A., Barclays Bank PLC, Deutsche Bank Trust Company Americas, The Royal Bank of Scotland plc, conceded that his clients did not learn about Plaintiffs purported material default until April. [DE 56 at 17, 18]. Plaintiff further highlights the fact that Defendants do not mention Fontainebleau being in default as a reason for their decision on March 3, 2009 to reject the March 2 Notice.

21. Plaintiff suggested at oral argument before Bankruptcy Judge Cristol that there is no available remedy for Defendants to "go back in time" to remove any loans already made to the Bank Proceeds Account. [AP DE 140, p. 46]. This may be true, but it is less clear that Defendants cannot refuse to perform its duty to make the loan in the first instance.

*Corp. v. United States*, 267 U.S. 12, 15–16, 45 S.Ct. 199, 200–01, 69 L.Ed. 490 (1925) (party may justify asserted termination, rescission, or repudiation of contract by proving that there was adequate cause, though it was not known to him until later); Restatement (Second) of Contracts § 225 cmt. e (1981) (Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused, regardless of whether a party knows or does not know of the non-occurrence of a condition of his duty). Accordingly, the Credit Agreement does not unambiguously prohibit Defendants' discovery of Plaintiff's default as basis for the retroactive excusal of performance.

### C. Turnover and Specific Performance

██ Plaintiff's claim for turnover pursuant to 11 U.S.C. § 542 was previously discussed in detail in my Order Granting Defendants' Motion for Withdrawal of Reference [DE 23]. The turnover provision of Bankruptcy Code applies only to tangible property and money due to debtor *without dispute* which are fully matured and payable on demand. *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir.1990) (emphasis added); *In re Palm Beach Heights Dev. & Sales Corp.*, 52 B.R. 181, 183 (Bankr. S.D.Fla.1985) (Cristol, J.) ("[t]here is no doubt that Congress enacting § 542 contemplated a turnover to the estate of properties and monies which were due to the estate *without dispute* which are fully matured and payable on demand."); *In re Ven–Mar Int'l, Inc.*, 166 B.R. 191, 192–93 (Bankr.S.D.Fla.1994) (dismissing turnover claim where "the [c]omplaint clearly indicates that there is dispute between the parties over whether any monies are due

and owing"). In light of my denial of Plaintiff's Motion for Partial Summary Judgment as to Defendants' liability in connection with the March 2 Notice, there is no basis for entry of an Order directing the turnover of funds to Debtors' estate.[22] Accordingly, it is hereby

ORDERED and ADJUDGED that

1. Plaintiff's Motion for Partial Summary Judgment on Liability With Respect to the March 2 Notice of Borrowing is DENIED.

2. Plaintiff's Motion for an Order Directing the Turnover of Funds to the Debtors' Estate is DENIED as premature until such time, if any, that a final judgment is entered for Plaintiff.

3. Plaintiffs Motion for Expedited Filing and Consideration of this Motion is DENIED as moot.

4. Defendants' Motion to Dismiss the Turnover Claim is DISMISSED without prejudice pending full discovery in this action.

5. Defendants' Motion to Deny or Continue Fontainebleau's Motion to Permit Discovery is GRANTED.

6. In conjunction with the issuance of this Order, an Order Requiring Compliance with S.D. Fla. L.R. 16.1 shall be issued. Further, a discovery conference in this matter shall take place before the Honorable Chris M. McAliley on September 25, 2009 at 2 pm.

DONE and ORDERED.

---

**22.** Defendants raise the argument that Plaintiff's turnover claim should be treated as a claim for specific performance, which should be denied because Plaintiff has not demonstrated an inadequate remedy at law. Be- cause Plaintiff does not seek specific performance in its Motion, and because its claim for turnover is denied, I do not reach the question of whether the claim should properly be analyzed as one for specific performance.