# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 11-2203

———————

| | | |
|---|---|---|
| Continental Holdings, Inc., Successor Continental Can Company, Inc., | * * * | |
| Plaintiff - Appellant, | * * | |
| v. | * * * | Appeal from the United States District Court for the District of Nebraska. |
| Crown Holdings Incorporated; Crown Cork & Seal Company; Crown Beverage Packaging, Inc., | * * * * | |
| Defendants - Appellees. | * | |

———————

Submitted: January 11, 2012
Filed: March 5, 2012

———————

Before BYE, SMITH, and COLLOTON, Circuit Judges.

———————

BYE, Circuit Judge.

Continental Holdings, Inc. ("Continental") sold its food and beverage metal can and can-end technology business to Crown Holdings, Inc. ("Crown") via a stock purchase agreement ("SPA") in March 1990. The parties disputed the extent of each other's resultant liabilities, as defined by section 10.3(a)(iv) of the SPA—the indemnity provision—in concurrent binding arbitration and judicial proceedings. After the arbitrator issued a decision interpreting the provision at issue, the district court granted summary judgment in favor of Crown on issue preclusion grounds,

dismissed Continental's claims, and denied Continental's motion for reconsideration and motion to alter or amend the judgment. Continental appeals. We affirm in part, reverse in part, and remand for further proceedings.

I

By the 1980s, Continental had become a large, diversified, international conglomerate. It owned a number of companies related to producing metal cans for the food and beverage industry—its "core" business—as well as many other non-related businesses. Around that time, Continental decided to reduce assets and exit the metal can business. It began by selling off many of its non-core assets, i.e., assets not related to the metal can business, including paper plants and mills, glass bottling plants, and financial firms. Continental then sold its remaining core, metal can business to Crown in 1990. Continental claims the purpose of the sale was to exit the food and beverage packaging industry altogether. Notably, this sale was structured as a stock sale, not an asset sale. Continental further claims it purposefully structured the sale as such so as to allow it to transfer to Crown all assets, as well as liabilities, related to the metal can business.

The parties agree the SPA clearly defines some of their respective liabilities. For example, Continental agreed to retain liability related to an ERISA class action, as well as 50% of known environmental liabilities associated with metal can plants which were active at the time of the SPA. Continental also agreed to indemnify Crown for any liabilities arising from businesses—past and existing—which may have been associated with the stock transferred pursuant to the SPA, but were *not* related to the metal can business. This would include liability for occupational exposure claims made by employees who once worked at those unrelated plants. Continental explains it needed to include this exception for unrelated businesses within the SPA terms because, as a result of some asset sales and restructuring which occurred prior to the stock sale, some of the liabilities for non-metal can businesses had been

consolidated into Continental Beverage Packaging, Inc., one of the two companies sold to Crown pursuant to the SPA. According to Continental, it structured the stock sale so only liabilities associated with the metal can businesses would transfer to Crown.

Yet, while some responsibilities are clear, the parties continue to argue over the extent to which Continental agreed to indemnify Crown for other liabilities. To resolve those disputes, the parties agreed to arbitrate the claims related to environmental liabilities. Continental, however, chose to litigate the parties' respective liability for former employees' occupational claims. The case before us on appeal turns on the interplay between those two proceedings.

Regarding the environmental claims, the parties agree Section 10.3(a)(iii)[1] of the SPA requires Continental to indemnify Crown for 50% of all liabilities relating to then-existing or known environmental issues associated with the assets sold as part of the SPA. However, the parties disputed in arbitration whether Section 10.3(a)(iv) of the SPA required Continental to indemnify Crown for environmental liabilities associated with plants related to the metal can business, which were closed or otherwise inactive at the time of the stock sale. Section 10.3(a)(iv) provides, in relevant part, as follows: (a) Seller agrees to indemnify Buyer and its affiliates against . . . (iv) all Liabilities relating to past or existing Businesses of the Companies and Subsidiaries other than the Business . . . ." J.A. at 87. Specifically, the parties argued over whether the phrase "other than the Business" modified "past or existing Businesses," or simply "existing Businesses," not including the term "past." The former interpretation, advanced by Continental, would mean Continental retained no

---

[1]In relevant part, Section 10.3 of the SPA states the following: "(a) Seller agrees to indemnify Buyer and its affiliates against and hold Buyer and its affiliates . . . harmless from all Liabilities arising out of . . . (iii) 50% of all Liabilities arising out of the matters described on schedule 3.16 . . . ("Environmental Liabilities") . . . ." Schedule 3.16 contains a list of certain, known environmental liabilities. J.A. at 87.

liability for past businesses (i.e., those closed or otherwise inactive at the time of the SPA), or businesses existing at the time of the SPA, so long as the businesses were related to metal can production. The latter interpretation, advanced by Crown, would mean Continental retained liability for all past businesses—regardless whether they related to metal can production—in addition to all businesses in existence at the time of the SPA that did not relate to metal can production.

While arbitration was pending, the parties began arguing over their respective liability for occupational hazards arising from plants which were inactive at the time of the sale, but which were *related* to the metal can business. The parties' arbitration agreement on environmental liabilities arguably did not encompass occupational hazard claims. Continental chose to file suit in Douglas County, Nebraska, on September 15, 2009, which Crown removed to federal court: this is the case which is now before us on appeal. This diversity case similarly required the district court to determine the extent of the parties' liability under the same provision of the SPA, Section 10.3(a)(iv).

Shortly after Continental filed its occupational hazard lawsuit, Crown filed a motion with the arbitrator. Crown requested a ruling that by seeking a potentially binding judicial interpretation of the exact same clause—Section 10.3(a)(iv), which was at the heart of the arbitration—Continental had violated Paragraph Four of the Arbitration Agreement. Paragraph Four stated that the parties had agreed they would not, during the pendency of the arbitration, prosecute or commence any suit or action against the other party "relating to" any of the matters which are the subject of the arbitration. While Continental admitted the interpretation of the indemnification provision was relevant to both the Nebraska lawsuit and the arbitration, it argued the parties had only agreed to arbitrate their environmental liabilities, and thus it was free to file suit to determine the parties' occupational liabilities. The arbitrator agreed with Continental and issued a written ruling on November 7, 2009. While the arbitrator was concerned "his view of the dispute might allow for inconsistent adjudications of

the meaning of Section 10.3(a)(iv) of the SPA, and agree[d] with Crown that inconsistent adjudications are not appealing to litigants[,]" the arbitrator concluded that the language of Paragraph Four of the Arbitration Agreement precluding litigation of matters "related to" the arbitration was not sufficiently clear to deny Continental a forum in which to bring its occupational hazard claims. Appellant's Mot. to Supp. R., Jan. 10, 2010, Ex. C at 6.

Shortly after the arbitrator issued his ruling, Crown filed a motion in district court to stay the proceedings pending arbitration. In its motion, Crown explained the "[a]rbitration involves a dispute concerning past and future environmental response costs and defense costs arising out of . . . [the SPA] . . . and involves the interpretation of Section 10 of the SPA." J.A. at 13. Furthermore, Crown informed the court that, through arbitration, the parties were seeking "a determination of Continental's indemnification responsibilities for third party claims, as well as a definitive interpretation of Article 10 of the SPA." Id. at 14. Finally, Crown urged the district court to stay the proceedings "[i]n light of the overlap of issues, . . . and the upcoming Arbitration hearing that will address the very issue before this Court[, and] . . . to avoid inconsistent adjudications and the burdensome and duplicative nature of dual proceedings." Id.

Continental opposed Crown's motion, and urged the court not to stay the proceedings. Continental warned the court arbitration may take too long in light of the contentious relationship of the parties, and the additional document and discovery requests pending. In support of its memorandum in opposition to the motion to stay, Continental submitted a number of documents it had prepared and submitted to the arbitrator in response to Crown's previous, similar motion. Continental argued, as it had before the arbitrator, the parties had intended to limit the arbitration to resolution of "environmental claims and defenses," which did not include the occupational exposure claims then-pending before the district court. Evidence in Support of Opp. to Def.'s Mot. to Stay, Ex. 4 at 6. Furthermore, Continental argued the underlying

facts of each claim were sufficiently different to allow parallel proceedings. Id. at 7-10. At the same time, Continental recognized the arbitration would require an interpretation of Section 10.3(a)(iv). In a letter dated November 4, 2009, which Continental submitted to the district court, Continental reiterated its position that "the environmental claims and defenses at issue in [the] arbitration potentially trigger many other provisions of the underlying Stock Purchase Agreement ("SPA"), including but not limited to those relating to: . . . (k) Liability for plants disposed of prior to the SPA under Section 10.3(a)(iv)." Pl.'s Evidence in Support of Opp. to Def.'s Mot. to Stay, Ex. 5 at 2-3.

The court denied Crown's motion to stay the proceedings, stating "[t]he parties no longer dispute that the claims in this litigation are non-arbitrable claims. After reviewing the complaint and the parties' evidentiary submissions, the Court finds it is not appropriate to stay this action pending the outcome of the parties' arbitration." J.A. at 17.

A few weeks later, Continental submitted a letter to the arbitrator asking for partial summary judgment on several key issues, and requesting "a legal interpretation of these limited indemnities . . . based on the plain meaning of the language used by the parties in the SPA . . . ." J.A. at 172. Specifically, Continental asked the arbitrator to rule that Continental "did not agree to indemnify Crown for unknown liabilities arising from 'Business' facilities sold prior to the Closing; accordingly, such liabilities belong to Crown." Id. Continental argued to the arbitrator that, as a matter of law, and pursuant only to the intrinsic language of the SPA, its proposed interpretation of Section 10.3(a)(iv) was correct. It stated "it is clear that with respect to four key issues the Transaction Documents [i.e., the SPA] are unambiguous and capable of a plain meaning legal interpretation now, without need for a full evidentiary hearing." Id. at 175. Further, Continental submitted that "[t]he meaning of the language of Section 10.3(a)(iv) could not be plainer in reflecting the parties' intent that Continental

was providing an indemnity only for 'past or existing businesses' that were not part of the Business [i.e., the core metal can production Business]." Id. at 177.

After briefing by both parties and oral argument, the arbitrator issued a written decision. In his decision, the arbitrator acknowledged both parties' interpretations were "plausible," but rejected Continental's interpretation, denied its motion for summary judgment, and entered an order adopting Crown's interpretation as a matter of law. The arbitrator concluded the meaning of "the Business," as used in Section 10.3(a)(iv) of the SPA, "Indemnification by Seller," referred only to the active metal can plants which were in existence and were transferred to Crown as part of the SPA. Id. at 102. Specifically, the arbitrator held that "'existing businesses' is modified by 'other than the Business' and 'past businesses' is not." Id. Accordingly, the arbitrator concluded Continental must indemnify Crown for any liabilities arising from metal can plants which were inactive or closed at the time of the sale as Crown only assumed liability for existing, active plants sold pursuant to the SPA.

Shortly after the arbitrator issued his opinion, Crown filed a motion for summary judgment in the district court, arguing Continental was precluded from further litigating the meaning of Section 10.3(a)(iv). The district court agreed with Crown, and held that the arbitrator's decision bound it:

> Although the JAMS Arbitration does involve a separate and distinct case between the parties, relating to the issue of indemnity obligations for certain environmental liabilities, the issue that was before [the arbitrator] in determining the correct interpretation of Section 10.3(a)(iv) of the SPA is the same issue that is now before this court. As the issue was before [the arbitrator] upon Continental's own motion, Continental fully briefed and orally argued the issue before [the arbitrator], and [the arbitrator] correctly based his decision solely on the intrinsic evidence (the language of the SPA) pursuant to New York contract law,[2] this court

[2]The parties agree New York law governs the interpretation of this contract.

-7-

finds that Continental had a full and fair opportunity to litigate the issue in the JAMS Arbitration. Thus, [the arbitrator's] interpretation of Section 10.3(s)(iv) of the SPA is binding on this Court, Continental is precluded from relitigating the issue, and Crown's motion for summary judgment will be granted.

Mem. Op. Granting Summ. J., Jan. 13, 2011, at 7-8; J.A. at 221-22.

Continental then filed a motion for reconsideration, or in the alternative, to alter or amend the judgment, arguing that since the arbitrator found both interpretations to be "plausible," the arbitrator must therefore have found the provision to be ambiguous, and thus factual issues remained which should not have been resolved on summary judgment. Pl.'s Br. in Supp. Mot. for Recons. or Alter or Am. J., Jan. 27, 2011, at 2-3; J.A. at 232. The district court rejected Continental's argument the use of the word "plausible" meant the arbitrator necessarily found the provision "ambiguous." Instead, the court found that the arbitrator adequately explained why Crown's position was the clear winner based on a reading of the entire SPA. Furthermore, because the arbitrator's interpretation was "within the provisions of New York law[,]" it was binding on the district court and under the doctrine of collateral estoppel, the district court found it could not re-examine the issue. Accordingly, the district court denied Continental's motion to reconsider its judgment.

In addition to denying the motion, however, the district court amended its judgment to clarify Continental's responsibilities: "As [the arbitrator] found, plaintiff must indemnify defendants for 50% of liabilities concerning the food and beverage metal can business and the metal can and [can-end] technology of the Companies and their Subsidiaries as they existed at the time of the SPA and which were sold pursuant to the SPA." Mem. Op., May 2, 2011, at 10; J.A. at 240. On appeal, the parties agree the court's language indicates Continental should be responsible not only for 50% of all *environmental* liabilities (as described in Schedule 3.16), but also Continental must

indemnify Crown for 50% of *all* liabilities associated with the active metal plants at the time of the SPA.

Continental appeals the grant of summary judgment and the district court's denial of its motion to reconsider or alter or amend its judgment.

II

"In reviewing the district court's grant of summary judgment, we review de novo its conclusions of law, including the availability of issue preclusion." Liberty Mut. Ins. Co. v. FAG Bearings Corp., 335 F.3d 752, 757 (8th Cir. 2003) (internal citation omitted); see also Followell v. United States, 532 F.3d 707, 708 (8th Cir. 2008) (applying de novo review to the district court's dismissal of plaintiff's claim with prejudice on res judicata and collateral estoppel grounds). "We look to state law in determining whether to apply issue preclusion." Liberty Mut. Ins., 335 F.3d at 758. The SPA in this case provides that New York law governs its interpretation. J.A. at 95, SPA § 11.6.

A decision regarding a motion for reconsideration is reviewed for abuse of discretion. Arnold v. ADT Sec. Servs., Inc., 627 F.3d 716, 721 (8th Cir. 2010). This Court also reviews decisions on motions to alter or amend for abuse of discretion. Anheuser-Busch, Inc. v. John Labatt Ltd., 89 F.3d 1339, 1349 (8th Cir. 1996).

Continental argues first that the district court incorrectly altered its judgment to hold Continental liable for 50% of *all* liabilities associated with active plants sold to Crown. Instead, Continental contends, the 50% indemnity clause, as it relates to active plants which were sold to Crown pursuant to the SPA, only applies to *environmental* liabilities, not *all* liabilities, which would include the occupational exposure claims at issue in the judicial proceedings.

In addition, Continental argues issue preclusion does not apply, and that we should either enter judgment in its favor regarding the interpretation of Section 10.3(a)(iv), or alternatively, allow Continental to present extrinsic evidence to the district court in support of its interpretation. Continental contends that because the arbitration was limited to environmental claims, it has therefore not yet been afforded a full and fair opportunity to litigate the interpretation of Section 10.3(a)(iv) as it relates to occupational claims. Continental supports its argument by again claiming that when the arbitrator recognized both parties' interpretations were "plausible," he thereby concluded the indemnity provision was ambiguous. Because the language of the provision is ambiguous, Continental argues, the parties should have been allowed to present extrinsic evidence of their original intent. Continental then references a number of affidavits it submitted to the district court in opposition to Crown's motion for summary judgment. The evidence Continental attempted to present to the district court, and now provides on appeal, supports its claim Crown assumed liability for occupational exposure, worker's compensation, and pension claims—factual situations not at issue in the arbitration.[3] J.A. at 15. Continental explains it did not present such extrinsic evidence to the arbitrator because the "arbitration was limited to environmental claims." Appellant Br. at 13.

## A. The 50% Indemnity Clause

Both parties agree the district court mistakenly clarified its previous summary judgment order to state Continental should be liable for 50% of not only environmental liabilities associated with active plants which were sold to Crown pursuant to the SPA, but also of all liabilities associated with such plants. See Appellee's Br. at 15-16 ("Crown agrees with Continental that Section 10.3(a)(iii) of

---

[3]Continental also references Robert Julian's affidavit, who was the primary negotiator for the sale of the Business to Crown, in which he explains the purpose of the stock sale was to transfer all liability, for past and present business related to the metal can production, to Crown.

the SPA is limited to certain 'Environmental Liabilities' only, which are the subject of the JAMS Arbitration. . . . Continental is not required to indemnify Crown for non-environmental occupational exposure claims arising from food and beverage can plants still active and sold to Crown as part of the SPA . . . .").

Continental asks this court to vacate and remand the district court's opinion to the extent it makes this erroneous conclusion. Crown, however, argues no remand is necessary since the parties' positions are clear and in agreement on the matter. Under the Federal Rules of Civil Procedure, a district court's ruling should be reversed if the error affects the substantial rights of a party. See Fed. R. Civ. P. 61; see also, e.g., Tyler v. White, 811 F.2d 1204, 1207 (8th Cir. 1987) (noting a reversible error is one which affects the substantial rights of a party).

The district court's second order and opinion may affect Continental's financial future because it indicates Continental must indemnify Crown for 50% of all liabilities stemming from active plants sold to Crown. We find this possibility sufficient to conclude the court's order affects Continental's substantial rights. Accordingly, we vacate the district court's second Memorandum Opinion to the extent necessary to correct this error, and remand with instructions to clarify that the 50% indemnity provision only applies to environmental liabilities pursuant to Schedule 3.16, as agreed to by the parties.

## B. Issue Preclusion

Under New York law, "[i]t is settled that the doctrine of *res judicata* is applicable to arbitration awards and may serve to bar the subsequent relitigation of a single issue or an entire claim." Matter of Ranni's Claim, 58 N.Y.2d 715, 717 (N.Y. 1982). The collateral estoppel doctrine, i.e., issue preclusion, "applies only if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate

-11-

the issue in the earlier action." City of New York v. Welsbach Elec. Corp., 9 N.Y.3d 124, 128 (N.Y. 2007) (internal quotation marks and citation omitted). "The burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in the prior action or proceeding." Parker v. Blauvelt Volunteer Fire Co., Inc., 93 N.Y.2d 343, 349 (N.Y. 1999) (internal quotation marks and citation omitted). "[T]he fundamental inquiry is whether re-litigation should be permitted in a particular case in light of what are often competing policy considerations, including fairness to the parties, conservation of resources of the court and the litigants, and the societal interests in consistent and accurate results." Soldiers', Sailors', Marines' & Airmen's Club, Inc. v. Carlton Regency Corp., 911 N.Y.S.2d 774, 778 (N.Y. Sup. Ct. 2010). "Since the consequences of a determination that a party is collaterally estopped from litigating a particular issue are great, strict requirements for application of the doctrine must be satisfied to insure that a party not be precluded from obtaining at least one full hearing on his or her claim." N. Shore-Long Island Jewish Health Sys., Inc. v. Aetna U.S. Healthcare, Inc., 811 N.Y.S.2d 424, 426 (N.Y. App. Div. 2006) (internal quotation marks and citation omitted).

Applying this standard to the case at hand, we have little doubt Crown met its burden to prove the exact same issue—the meaning of "the Business" within Section 10.3(a)(iv) of the SPA—was before the arbitrator and the district court, and was necessary to both outcomes. There is only one indemnity provision within the SPA, and its meaning will determine the respective liabilities of the parties, whether it relates to environmental, occupational, or any other type of third-party claim which may arise. Continental cannot, and does not, dispute the identity or the decisiveness of the issue in the two proceedings.

Continental does, however, dispute the district court's conclusion it had a full and fair opportunity to litigate the meaning of Section 10.3(a)(iv) before the arbitrator. New York courts have encouraged a common-sense approach to issue preclusion:

> A determination whether the first action or proceeding genuinely provided a full and fair opportunity requires consideration of the realities of the prior litigation, including the context and other circumstances which may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him. Among the specific factors to be considered are the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

Ryan v. N.Y. Tel. Co., 62 N.Y.2d 494, 501 (N.Y. 1984) (internal quotation marks and citation omitted); see also Buechel v. Bain, 97 N.Y.2d 295, 303 (N.Y. 2001) ("The doctrine . . . is a flexible one, and the enumeration of these elements is intended merely as a framework, not a substitute, for case-by-case analysis of the facts and realities.").

Continental offers essentially two arguments to support its claim as to it not having a full and fair opportunity to litigate the meaning of Section 10.3(a)(iv) before the arbitrator. First, Continental contends the "Arbitration Decision is not entitled to preclusive effect here because the arbitration was limited to environmental claims and Continental did not have the opportunity to litigate its indemnity obligations for occupational exposure claims in the environmental arbitration." Appellant's Br. at 19. Continental cites to Saca v. Canas, 903 N.Y.S.2d 861 (N.Y. Sup. Ct. 2010), for the proposition that Continental has been "denied the opportunity to litigate its indemnity obligations for occupational exposure claims arising from inactive metal can plants." Appellant's Br. at 39-40. Furthermore, Continental argues it had no incentive to

present any evidence relevant to the occupational exposure claims because the arbitrator conceded in his November 7, 2009, order—in which the arbitrator concluded Continental had not violated the terms of the arbitration agreement by filing suit in a matter "related to" the arbitration—that "his view of the dispute might allow for inconsistent adjudications of the meaning of Section 10.3(a)(iv) of the SPA . . . ." Appellant's Mot. to Supp. R., Jan. 10, 2010, Ex. C at 6.

To begin with, Saca is distinguishable. Saca involved an action to recover for personal injuries allegedly sustained in a motor vehicle accident. 903 N.Y.S.2d at 864. Prior to bringing suit, the parties in Saca had also been involved in an arbitration: the arbitrator awarded the plaintiff, Jose Saca, one million dollars, and assigned 100% of the liability to Canas's co-defendant. Id. Canas then filed a motion asking the New York Supreme Court to find Saca collaterally estopped from further litigating Canas's liability in the instant action because the plaintiff had already been given a full and fair opportunity to establish liability on the part of the Canas defendants in the arbitration, but had failed to do so. Id. The court disagreed and denied the motion, finding Saca had no reason to fully litigate his claims against Canas in the arbitration. Notably, the court based its finding on a very specific reason: the parties had entered into a stipulation agreement which made "the findings and award of the . . . arbitration . . . not . . . binding on any parties in the New York litigation." Id. at 865, 65-67. "Since the stipulation expressly made the outcome of the [under-insured motorist] arbitration non-binding on this [judicial] action, the stipulation discouraged plaintiffs from fully litigating their claims against all defendants and encouraged them to focus their efforts on establishing Erskine as the sole proximate cause of the underlying accident." Id. at 867.

Continental has not identified any such similar stipulation agreement. The fact the parties agreed to litigate environmental claims via arbitration did not preclude Continental from fully advocating for its proposed meaning of Section 10.3(a)(iv) before the arbitrator. Continental chose to advocate for a finding supporting its

interpretation by arguing the provision was interpretable as a matter of law, based solely on the "plain meaning of the language used by the parties in the SPA" and contended "the Transaction Documents are unambiguous and capable of a plain meaning legal interpretation now, without need for a full evidentiary hearing."  J.A. at 172, 175.  To be sure, New York law provides that, where possible, a contract should be interpreted without looking to extrinsic evidence so long as the provision is unambiguous.

> [W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.

W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (N.Y. 1990).  Yet, nothing precluded Continental from arguing in the alternative that if the court found the provision ambiguous, it should look to extrinsic evidence to determine the provision's meaning.  See, e.g., Horse Shoe Capital v. Am. Tower Corp., No. 650512/10, 2011 WL 453004, at *2 (N.Y. Sup. Ct. Jan 28, 2011) (describing a case in which the parties disagreed over whether the terms of a contract were ambiguous, and noting the "plaintiff argues that these terms are ambiguous . . . [and] offers parol evidence to support its interpretation of these terms").  For that matter, Continental could have urged the court to find the provision ambiguous in the first place and petitioned for a hearing on extrinsic evidence.  Had Continental chosen to argue in favor of ambiguity, and had the court agreed, nothing would have prevented Continental from presenting the evidence it now hopes to introduce that indicates—in the context of occupational exposure claim liability—the parties may in fact have intended to transfer liability for closed or inactive metal can plants to Crown.  But cf. W.W.W. Assocs., Inc., 77 N.Y.2d at 163 ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.") (internal quotation marks and citation omitted).  While

-15-

it is true the parties had agreed the arbitration forum was to be limited to environmental claims, it is also true the interpretation of Section 10.3(a)(iv) affects the parties' respective liability for all third-party claims, no matter the type. The fact Continental's strongest evidence—evidence indicating the parties intended Crown to take on liability for closed or otherwise inactive metal can plants—developed in the context of occupational claims, would not have precluded Continental from using such evidence to explain the parties' general intention in drafting Section 10.3(a)(iv). Accordingly, simply because the parties limited the arbitration to environmental claims, it does not mean Continental thereby "did not have the opportunity to litigate its indemnity obligations for occupational exposure claims in the environmental arbitration." Appellant's Br. at 19.

Second, Continental contends that since the arbitrator noted both parties' interpretations were "plausible," the provision was therefore "ambiguous" under New York law and not capable of legal interpretation; rather, in such a situation, extrinsic evidence should have been presented. Continental argues that failure to offer it an evidentiary hearing meant it was not afforded a full and fair opportunity to litigate the meaning of Section 10.3(a)(iv) before the arbitrator, and therefore it should not have been precluded from re-litigating the interpretation of Section 10.3(a)(iv) in the district court.

"Whether a contract is ambiguous is a question of law for the court, and extrinsic evidence should not be considered to create an ambiguity where there otherwise would be none." Ferghana Partners Inc. v. Bioniche Life Scis. Inc., No. 650747/09, 2011 WL 5385095, at *6 (N.Y. Sup. Ct. Oct. 5, 2011) (citing W.W.W. Assocs., Inc., 77 N.Y.2d at 162); see also Gilpin v. Oswego Builders, Inc., 930 N.Y.S.2d 120, 122 (N.Y. App. Div. 2011) ("The interpretation of an unambiguous contract provision is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.") (internal quotation marks and citation omitted). "[A] provision is

unambiguous if it has a definite and precise meaning, and is not reasonably susceptible to differing interpretations." Ferghana Partners Inc., 2011 WL 5385095, at *6 (internal quotation marks and citation omitted). "To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole." Brad H. v. City of New York, 928 N.Y.S.2d 221, 224 (N.Y. 2011). "Clear language does not become ambiguous just because the parties argue differing interpretations." Ferghana Partners Inc., 2011 WL 5385095, at *6.

We recognize that if a term is ambiguous, the proper procedure is to deny summary judgment and allow the parties to present extrinsic evidence. See, e.g., Harkin v. WDF, Inc., No. 107073/08, 2011 WL 420665, *4 (N.Y. Sup. Ct. Jan. 7, 2011) (denying summary judgment where the court determined a contract ambiguous and the parties had not yet presented extrinsic evidence). Furthermore, New York courts have used the word "plausible" to describe competing interpretations which required the introduction of extrinsic evidence to ascertain the parties' intent. See Shearson Lehman Bros. Holdings, Inc. v. Schmertzler, 500 N.Y.S.2d 512, 517 (N.Y. App. Div. 1986) (finding two "plausible" meanings to create ambiguity and explaining that "[w]hen viewed realistically in the business context in which the agreement was signed, the conclusion seems to us compelling that the meaning of the term was at best, from plaintiff's viewpoint, ambiguous"); Winston v. Mezzanine Inv., L.P., 648 N.Y.S.2d 493, 499 (N.Y. Sup. Ct. 1996) (finding a contract ambiguous where terms were not adequately defined and both parties interpretations were "plausible"); Carbone v. Carbone No. 18530/2003, 2010 WL 1223927, at *2 (N.Y. Sup. Ct. Mar. 17, 2010) (stating both parties offered "plausible interpretations of the term, establishing that the term is ambiguous as applied to this agreement[,]" and remanding for a hearing because the "[c]ourt cannot and should not speculate or rule as to the parties understanding without further evidence"). On the other hand, the term "plausible" has also been used to describe competing interpretations even when the court ultimately determined only one interpretation was reasonable as a matter of law. See RM Realty Holdings Corp. v. Moore, 884 N.Y.S.2d 344, 346 (N.Y. App. Div.

2009) (finding an interpretation "plausible" but "defyi[ng] logic" and thereby not "*reasonably* susceptible of more than one interpretation").

In this case, we do not believe the arbitrator made an explicit finding the provision was ambiguous simply by calling both Continental's and Crown's respective interpretations "plausible." As noted by the district court, the arbitrator adequately explained why he rejected Continental's interpretation upon considering all of Section 10, and the SPA as a whole, and found, as a matter of law, Crown's proposed meaning to be the only reasonable interpretation. See Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (noting that the court should not find ambiguity based on the interpretation of one party to a contract, where that interpretation would "'strain the contract language beyond its reasonable and ordinary meaning'") (quoting Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459 (N.Y. 1957)); Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (N.Y. 1978) (finding ambiguity only where "reasonable men may reasonably differ" as to the interpretation of the contract). Because the arbitrator found the provision unambiguous, the arbitrator made no mistake in refusing to order an evidentiary hearing, and such refusal may not serve as grounds for Continental to claim it was denied a full and fair opportunity to litigate the meaning of Section 10.3(a)(iv) before the arbitrator. Furthermore, absent unusual circumstances not present here, see N.Y. Arbitration Law § 7511 (McKinney 2011), it is not our place to question whether the arbitrator got it right. Under New York law, "courts lack authority to review arbitral decisions, even where an arbitrator has made an error of law or fact." Eastman Assocs., Inc. v. Juan Ortoo Holdings, Ltd., 935 N.Y.S.2d 166, 167 (N.Y. App. Div. 2011) (internal quotation marks and citations omitted). We therefore decline to analyze the merits of the parties' competing interpretations.

Moreover, other facts of this case indicate Continental knew exactly what was at stake in both proceedings, had every incentive to litigate the provision's meaning, and made its strategic choices accordingly. Notably, it was Continental who brought

-18-

the summary judgment motion to the arbitrator. See Catalano v. Applied Biometrics Prods., Inc., No. 03 Civ. 0046(NRB), 2003 WL 22004902, at *6 (S.D. N.Y. 2003) ("[M]ost importantly the fact that petitioner himself was the party who raised the personal liability issues . . . indicate[s] that petitioner had a full and fair opportunity to litigate the issues that were decided against him in arbitration."). In its motion for partial summary judgment, Continental clearly asked for the arbitrator to interpret the provision at issue. Furthermore, while Crown voiced its concern about inconsistent judgments to both the arbitrator and the district court, and requested a stay of the district court proceedings, Continental opposed those motions. In opposing the motions, Continental again recognized the same issue was at stake. In light of this realization, we are hard-pressed to conclude Continental was somehow not alerted it should litigate the meaning of Section 10.3(a)(iv) to the best of its ability. Continental may not rely on the arbitrator's remark his ruling might result in "inconsistent outcomes" to support its claim it simply did not realize everything was on the line: New York law clearly treats arbitration decisions the same as judicial determinations for issue preclusion purposes. See Matter of Ranni's Claim, 58 N.Y.2d at 717.

For these reasons, we find Continental has failed to meet its burden of proving it was not afforded a full and fair opportunity to litigate the meaning of Section 10.3(a)(iv). The district court, therefore, correctly determined Continental was precluded from further litigating the provision's meaning, properly granted summary judgment in favor of Crown, and did not abuse its discretion in denying Continental's motion to reconsider.

III

Accordingly, we affirm in part and vacate and remand in part, with instructions to amend the district court's order in a manner consistent with this opinion.

_____

-19-